# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JOSEPH Y. HO**
Deputy Attorney General
Indianapolis, Indiana

FILED
Feb 24 2014, 9:16 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVID J. HARMAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  45A05-1304-CR-153 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Clarence D. Murray, Judge
Cause No. 45G02-1106-FA-32

**February 24, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

David J. Harman ("Harman") appeals, following a jury trial, his conviction and sentence for Class A felony attempted murder.[1]

We affirm.

ISSUES

1. Whether the trial court abused its discretion in its evidentiary rulings.

2. Whether the trial court erred in sentencing Harman.

FACTS

In May 2011, Harman, who was nicknamed "Red," was dating Cathy Jenkins ("Cathy"), who had previously been married to J.R. Jenkins ("Jenkins"). Jenkins and Cathy, who divorced in 2007, had two sons, Joe and A.[2] Jenkins lived on Oakdale Avenue in Hammond, Indiana, and A. lived with him. Cathy and Joe lived with Cathy's mother in Illinois. At times, Cathy stayed with Harman, who lived with his mother in Illinois. Cathy and Harman also stayed sometimes with Cathy's friend, Lori Jones ("Jones"), and Jones's fiancé, Kevin Hanshew ("Hanshew"), who lived in Highland, Indiana.

On May 31, 2011, Harman was doing yard work for Hanshew and Jones at their house in Highland. That afternoon, while Jones was out running an errand, Harman asked Hanshew to drive him to Hammond. Harman directed Hanshew on where to drive and had him park in an alley near Jenkins's house. Harman told Hanshew that he would

---

[1] Ind. Code §§ 35-41-5-1, 35-42-1-1.

[2] At the time of the crime, Joe was over eighteen years of age, and A. was fourteen years old.

2

be gone "a couple of minutes." (Tr. 135). Hanshew waited twenty minutes and then left because he was hot.

During this time, Harman went to Jenkins's house and asked to speak to him about Jenkins's older son, Joe. Jenkins invited Harman in, and they sat at the kitchen table. As they were talking, forty-seven-year-old Harman "sprung out with his left hand" and hit seventy-seven-year-old Jenkins in the face, knocking off Jenkins's glasses and toupee. (Tr. 313). Harman then started "beating" Jenkins. (Tr. 313). As Jenkins was "slumped down . . . against the wall and the table," Harman "busted" a "heavy duty" wooden chair over Jenkins. (Tr. 314). When Jenkins tried to get off the ground, Harman repeated, "lay there and die, you son of a bitch, you're dead, you're dead" and "[l]ay there and die, you son of a bitch, you're worth more to us dead than you are alive." (Tr. 314). Harman continued to hit and kick Jenkins. Then, as Jenkins was trying to get up, Harman "slic[ed]" Jenkins's throat with some sort of sharp object. (Tr. 315). Harman cut Jenkins's throat with such force that he cut "through skin, muscle and into [his] thyroid cartilage." (Tr. 92). As Harman cut him, Jenkins asked Harman, "Red what the F are you doing[?]" (Tr. 315). Jenkins saw that his "blood was shooting everywhere" and heard Harman repeating, "you're dead, you son of a bitch, lay there and die." (Tr. 315). Jenkins then lost consciousness.

Thereafter, Harman called Hanshew, who was "almost halfway home" to Highland, and asked Hanshew to pick him up. (Tr. 137). As Hanshew drove on Oakdale Avenue, Hanshew saw Harman "beating and kicking" an older man on a porch. (Tr. 138). When Hanshew saw that the man being beat had "blood all over" him, Hanshew

3

kept driving and returned to his house. (Tr. 139). Harman then called Jones, yelling that Hanshew had left him, and asked her to pick him up in Hammond. After Jones dropped Harman back at the house, he took a shower, washed his clothes, and threw away his boots.

Meanwhile, Jenkins regained consciousness and was able to get up and eventually make his way to the house of Janet (a/k/a Jackie) Jenkins ("Jackie"),[3] who lived a few houses down from him. When Jenkins went in Jackie's house, he was weak and "his neck was bleeding profusely." (Tr. 416). Jackie sat him on the sofa, put a towel on his neck, and called the paramedics. When Jackie asked Jenkins who had hurt him, he responded, "Red, Cathy's boyfriend[.]" (Tr. 317). Jenkins then lost consciousness due to his blood loss.

Later in the evening, Cathy arrived at Jenkins's house to drop off A. When she arrived, she saw the police and police tape around Jenkins's house. Cathy then went to the police station to speak to the police. Thereafter, Cathy called Jones to tell her that she would be delayed in getting to Jones's house and informed Jones about what happened at Jenkins's house with the police. After Jones got off the phone, she went into the bedroom where Harman was sleeping, hit him on his feet, and asked "what did you do[?]" (Tr. 236). Harman responded, "I kicked the shit out of him, I should've fucking killed him." (Tr. 236).

Jenkins was initially taken to a local hospital but was then airlifted to a hospital in Illinois due to the traumatic nature of his injuries. Jenkins suffered a subdural hematoma,

---

[3] Jackie was Jenkins's ex-wife, and they divorced in 1972.

4

a neck fracture, and an "extremely large and deep neck wound." (Tr. 75). Jenkins's neck wound stretched "clear across his neck" and was so deep that his trachea was cut. (Tr. 79). Jenkins's neck laceration was so "extensive" that the trauma surgeon described it as "filleted." (Tr. 79). Jenkins's injuries caused him to undergo a "traumatic arrest" where his loss of a large amount of blood caused his heart to stop. (Tr. 76). Jenkins spent a total of approximately two months in the hospital due to his injuries and complications from them. For a time, Jenkins was unable to talk and had to have a tracheostomy tube and a feeding tube.

On June 7, 2011, police officers went to the hospital to interview Jenkins. Jenkins, who was unable to speak because of his tubes, identified Harman as the perpetrator of the crime against him by writing the name "Red" on a piece of paper. Thereafter, the State charged Harman with Count I, Class A felony attempted murder; Count II, Class B felony aggravated battery; and Count III, Class C felony battery.

The trial court held a five-day jury trial from January 28, 2013 to February 1, 2013. Prior to trial, the State filed a motion in limine, seeking to exclude evidence of Jenkins's prior convictions, arrests, and charges pursuant to Evidence Rules 401, 404(b), 608, and 609. Specifically, the State sought to preclude evidence regarding: (1) Jenkins's convictions, in Illinois in September 1979, for conspiracy to commit murder, solicitation to commit murder, and attempted murder;[4] and (2) Jenkins's guilty plea,

---

[4] Jenkins finished serving his sentences on these convictions in 1983.

5

"sometime prior" to May 2011, to threatening Cathy on the telephone in violation of a protective order issued by an Illinois court against him and in favor of Cathy.[5] (App. 73).

Prior to the presentation of witnesses, the trial court heard argument regarding the State's motion in limine. The State argued that the prior convictions and the protective order, which was issued as part of Jenkins and Cathy's dissolution, were not relevant and would confuse the issues at trial. Harman's counsel stated that he was not planning on introducing any evidence regarding Jenkins's 1979 criminal convictions "due to the remoteness in time" but argued that Jenkins's violation of the protective order protecting his ex-wife Cathy was "extremely relevant" because Harman was dating Cathy. (Tr. 19). The trial court granted the State's motion in limine to exclude evidence of the prior convictions and the protective order. Specifically, the trial court ruled:

> All right. The Court has an obligation to make sure that the jury hears relevant evidence and that it does not get confused or sidetracked on collateral matters or minutia that have no bearing on the case. Based on what I've heard so far, I'm granting the State's motion as to both of those issues as set forth in their motion in limine. The Court will not allow any testimony to be elicited regarding the conviction of Mr. Jenkins back in 79 or this issue of a protective order that was issued against Mr. Jenkins by a family law court in [Illinois]. If, of course, if the door's opened by Mr. Jenkins during his testimony to these issues or if there's otherwise some relevant, some relevance revealed through his testimony about these issues, then certainly the Court may reconsider it's [sic] ruling. And we will re-visit both these issues at the appropriate time during the trial as required by the rules.

(Tr. 26-27).

Harman's defense at trial focused on identification, with him contending that there was no "scientific evidence" to link Harman to the crime. (Tr. 71). During trial, prior to

---

[5] The violation of the protective order occurred almost seven months before the crimes at issue.

6

cross-examining Jenkins, Harman renewed his objection to the trial court's pre-trial limine ruling that he was precluded from presenting evidence regarding Jenkins's violation of the protective order entered in favor of Cathy. Also, as part of an offer to prove, he sought to introduce a police report on the protective order violation. Harman did not renew his objection or make an offer to prove regarding the trial court's pre-trial limine ruling that he could not present evidence regarding Jenkins's 1979 convictions.

The jury found Harman guilty as charged. At sentencing, the trial court determined that there were no mitigating circumstances. The trial court found the following to be aggravating circumstances: (1) the injury suffered by the victim was greater than the elements necessary to prove the crime; (2) Harman's criminal history; (3) the age of the victim being over sixty-five years of age; (4) the nature and circumstances of the "brutal" attack against the victim; (5) Harman possessed "a violent and depraved nature[;]" and (6) Harman's lack of remorse. (App. 90). The trial court merged Counts II and III into Count I due to double jeopardy concerns, entered judgment of conviction on the attempted murder conviction only, and imposed a forty-five (45) year sentence in the Department of Correction. Harman now appeals. Additional facts will be provided as necessary.

<u>DECISION</u>

1. <u>Evidentiary Rulings</u>

Harman contends that the trial court abused its discretion by (a) denying him an opportunity to make an offer to prove regarding a protective order issued against Jenkins; and (b) excluding evidence that Jenkins had been convicted in 1979 of conspiracy to

7

commit murder, solicitation to commit murder, and attempted murder.  We will review each in turn.

A. *Offer to Prove*

Harman argues that the trial court abused its discretion by denying him an opportunity to make an offer to prove regarding Jenkins's violation of the protective order entered in favor of Cathy.[6]  We disagree.

To reverse a trial court's decision to exclude evidence, there must have been error by the court that affected the defendant's substantial rights and the defendant must have made an offer of proof or the evidence must have been clear from the context.  *Stroud v. State*, 809 N.E.2d 274, 283 (Ind. 2004).  An offer to prove consists of three parts:  "(1) the substance of the evidence, (2) an explanation of its relevance, and (3) the proposed grounds for its admissibility."  *Nelson v. State*, 792 N.E.2d 588, 594 (Ind. Ct. App. 2003) (citing *Roach v. State*, 695 N.E.2d 934, 939 (Ind. 1998), *reh'g granted on other grounds*), *trans. denied*.  "[T]he purpose of an offer to prove is 'to preserve for appeal the trial court's allegedly erroneous exclusion of evidence.'"  *Arhelger v. State*, 714 N.E.2d 659, 664 (Ind. Ct. App. 1999) (quoting *Bradford v. State*, 675 N.E.2d 296, 302 (Ind. 1996), *reh'g denied*).  A party traditionally makes an offer to prove after the trial court has sustained an objection to the admission of the party's evidence.  *See Arhelger*, 714 N.E.2d at 664.  However, it may also be made before the trial court's ruling on an

---

[6] Harman also contends that the trial court's denial of the opportunity to make an offer to prove violated his due process rights under the federal and state constitutions.  Because Harman did not assert this constitutional argument at trial, he has waived it on appeal.  *See, e.g.*, *Saunders v. State*, 848 N.E.2d 1117, 1122 (Ind. Ct. App. 1999) (holding that the defendant waived his argument that excluded evidence violated his constitutional right to confront witnesses by failing to make that argument at trial), *trans. denied*.

8

objection in order to aid in the admissibility ruling. *See id.* "In general, 'a party has a right to make an offer of proof,' and 'it is reversible error for a trial court to deny a party the opportunity to explain the substance, relevance, and admissibility of excluded evidence with an offer of proof.'" *Duso v. State*, 866 N.E.2d 321, 324 (Ind. Ct. App. 2007) (quoting *Nelson*, 792 N.E.2d at 595).

In *Nelson*, a defendant's cross-examination question was not allowed when the trial court sustained the State's objection to the question. *Nelson*, 792 N.E.2d at 594. When the defendant informed the trial court that he would like to make an offer to prove, the trial court responded "No" and did not allow the defendant's counsel to discuss the matter any further. *Id.* On appeal, our Court held that the trial court had erred by denying the defendant's attempt to make an offer to prove, explaining that "[w]e cannot very well require trial counsel to make an offer of proof to preserve error on appeal, while at the same time we allow the trial court to deny counsel the opportunity to make such a record." *Id.* at 594-95.

Here, unlike in *Nelson*, the trial court did not deny Harman the opportunity to make an offer to prove. The record before us reveals that before cross-examining Jenkins, Harman's counsel asked the trial court for a sidebar hearing, during which he renewed his objection to the trial court's pre-trial limine ruling that excluded any evidence that Jenkins had previously violated a protective order entered in favor of Cathy. Harman's counsel then indicated that he was wanted to cross-examine Jenkins about the divorce proceedings between Jenkins and Cathy and some insurance policies that Jenkins had with his sons as beneficiaries. The trial court—reminding Harman's

9

counsel that the scope of the State's direct examination was that Harman "slashed [Jenkins's] throat, told him to die, you S.O.B., and that we're better off with you dead"—instructed counsel that he was confined to the scope of the direct examination. (Tr. 344). Harman's counsel responded that he "believe[d] that [he] should be able to go further than the State did on direct examination so that the jury [could] get a better understanding of the dynamics between the relationship of all three individuals prior to May 31st of 2011." (Tr. 345). The trial court told Harman that he was not entitled to go beyond the scope of direct because there was no testimony from Jenkins about protective orders, insurance policies, or relationships. The trial court, however, stated that Harman was "free to address those issues on [his] case in chief if [he] wish[ed] to present evidence." (Tr. 346). The trial court then affirmed its previous ruling excluding any evidence about the protective order.

Thereafter, Harman told the trial court that he had a police report from the protective order violation incident, and he "mov[ed] to make it part of the record as far as [his] objection to the Court's granting [of] the motion in limine[.]" (Tr. 353). The trial court responded that it was "not an offer of proof in a technical sense because [Harman] ha[d]n't attempted to introduce, elicit that testimony." (Tr. 354). Harman's counsel acknowledged that he would be unable to elicit such testimony due to the trial court's ruling on the motion in limine. The trial court then asked Harman's counsel if Harman was offering the police report as "an offer of proof" and arguing that the report would have been relevant had the trial court ruled that he could have introduced testimony regarding the protective order violation. (Tr. 355). Harman's counsel responded, "That

10

is correct, your Honor." (Tr. 355). The State then argued that the police report, which was dated November 1, 2010, was not relevant because it was remote in time and not shown to be connected to the crimes at issue. Harman's counsel argued that the report was relevant because it showed that Jenkins and Cathy had a "contentious divorce" in 2007 and because the report contained a quote from Cathy to police regarding the threat that Jenkins had made to her.[7] (Tr. 357). The trial court ruled that the report was not relevant, contained hearsay, and was remote in time and stated that it was refusing Harman's invitation to "speculate and stretch this." (Tr. 358). The trial court initially stated that it would "not accept [the police report] a[s] an exhibit for an offer of proof" because Harman had not shown any relevance. (Tr. 358-59). When Harman's counsel asked if the report needed to be marked for purposes of appeal, the trial court stated that it would mark it as being "offered" as Defendant's Exhibit C and "refused." (Tr. 359). Thereafter, Harman cross-examined Jenkins.[8]

Based on the record before us, we conclude that the trial court did not deny Harman the opportunity to make an offer to prove. Indeed, the trial court gave Harman the chance to explain the substance, relevance, and admissibility of the proposed

---

[7] According to the police report, Cathy told police that Jenkins had called and stated, "If you come over here something bad is going to happen to you, and I[']ll make it look like it was your fault." (Defendant's Ex. C).

[8] Harman neither called Jenkins as his own witness nor presented any other witnesses.

11

evidence. *Cf. Nelson*, 792 N.E.2d at 594. Thus, Harman has failed to show that the trial court abused its discretion regarding its evidentiary ruling on the protective order.[9]

B. *Exclusion of Evidence*

Harman also argues that the trial court abused its discretion by excluding evidence of Jenkins's 1979 convictions. Prior to trial, the trial court granted the State's motion in limine to exclude any evidence regarding these prior convictions. However, Harman never made an offer to prove at trial showing why evidence regarding the convictions was admissible. Therefore, he has waived this argument on appeal. *See Carter v. State*, 932 N.E.2d 1284, 1287 (Ind. Ct. App. 2010) ("The failure to make an offer to prove results in a waiver of the asserted evidentiary error.").

2. Sentencing

Harman's sentencing argument is a mélange of the following two arguments: (1) the trial court abused its discretion by failing to find mitigating circumstances; and (b) his sentence is "excessive" under Indiana Appellate Rule 7(B). (Harman's Br. 19). Before addressing his arguments, we pause to note that the focus of any challenge to a sentence under Appellate Rule 7(B) is whether the sentence is "inappropriate," not excessive. *See* App. R. 7(B) (providing that our Court may revise a sentence if we find it to be "inappropriate in light of the nature of the offense and the character of the offender").

---

[9] Harman makes no specific or cogent argument that the trial court abused its discretion by excluding evidence regarding the protective order violation. Even if he had raised such an argument, we would not review a challenge to the admissibility of this evidence because Harman did not make a proper offer. While his counsel provided the substance of the excluded evidence by submitting the police report and argued that he believed that evidence of the protective order violation was relevant, his counsel did not specifically identify the grounds for the admission of the testimony. Thus, he did not make a proper offer to prove. *Arhelger*, 714 N.E.2d at 665 (finding defendant did not make a "valid offer of proof" where defendant did not "even touch upon the grounds for . . . admission" of the cross-examination testimony).

Further, "our Supreme Court has made clear [that] inappropriate sentence and abuse of discretion claims are to be analyzed separately." *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008) (citing *See Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007)). Therefore, we will separately address each argument.

A. *Abuse of Discretion*

Harman argues that the trial court abused its discretion when it failed to recognize the following proffered mitigators: (1) his prior military service and honorable discharge; and (2) his "limited criminal history."[10] (Harman's Br. 12).

Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Anglemyer*, 868 N.E.2d at 490. One way in which a court may abuse its discretion is by entering a sentencing statement that omits mitigating circumstances that are clearly supported by the record and advanced for consideration. *Id.* at 490–91. However, a trial court is not obligated to accept a defendant's claim as to what constitutes a mitigating circumstance. *Rascoe v. State*, 736 N.E.2d 246, 249 (Ind. 2000). A claim that the trial court failed to find a mitigating circumstance requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Anglemyer*, 868 N.E.2d at 493.

---

[10] In the final sentence of his sentencing argument, Harman contends that the trial court erred by failing to find the support of his family and friends as a mitigating circumstance. Harman, however, cites to no authority and makes no cogent argument in support of this contention. Therefore, any such argument is waived. *See* Ind. App. R. 46(A)(8)(a) (requiring that an appellant's argument be supported by cogent argument and citations to relevant authority).

13

Harman first contends that the trial court erred by failing to find his prior military service as a mitigating circumstance. We acknowledge that the presentence investigation report indicates that Harman served three years in the United States Marines and was honorably discharged, and we recognize that service to our country is a commendable act. However, military service is not necessarily a mitigating circumstance, *see Forgey v. State*, 886 N.E.2d 16, 23–24 (Ind. Ct. App. 2008) (finding trial court was within its discretion in rejecting defendant's military record as a mitigating factor), and Harman fails to explain why it should be considered so in this case. Indeed, as the State pointed out during the sentencing hearing, "Harman's actions were the actions of a monster and not of a Marine[.]" (Tr. 940). Accordingly, the trial court did not abuse its discretion by not finding Harman's military service to be a mitigating circumstance. *See Forgey*, 886 N.E.2d at 23–24; *see also Pennington v. State*, 821 N.E.2d 899, 905 (Ind. Ct. App. 2005) (finding no abuse of discretion where the defendant failed to show that proposed mitigating factor of military service was significant and clearly supported in the record); *Garrison v. State*, 575 N.E.2d 700, 704-05 (Ind. Ct. App. 1991) (determining that the trial court appropriately exercised its discretion when refusing to consider the defendant's honorable discharge from the military as a mitigating circumstance), *trans. denied*.

Harman also suggests that the trial court should have found his "limited criminal history" to be a mitigating circumstance. (Harman's Br. 12). The record reveals that Harman had a criminal history, including a Class D felony aggravated driving while intoxicated conviction, a misdemeanor operating a vehicle while intoxicated conviction, and a reckless driving infraction. Accordingly, we cannot say that the trial court erred by

14

rejecting Harman's criminal history as a mitigating circumstance. *See, e.g.*, *Robinson v. State*, 775 N.E.2d 316, 321 (Ind. 2002) (explaining that trial court properly attached no mitigating weight to defendant's criminal history consisting of one misdemeanor possession of marijuana conviction and some traffic infractions); *Townsend v. State*, 860 N.E.2d 1268, 1272 (Ind. Ct. App. 2007) (finding no abuse of discretion in trial court's refusal to find a mitigating circumstance in defendant's criminal history consisting of single misdemeanor conviction for reckless driving), *trans. denied*.

B. *Inappropriate Sentence*

Harman contends that his forty-five-year sentence is inappropriate. Specifically, he argues that his sentence was "excessive" given his character. (Harman's Br. 21).

We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). The defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). The principal role of a Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Id.* at 1224.

When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence "is the starting point the Legislature has selected as an appropriate

15

sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. Here, the jury found Harman guilty of Class A felony attempted murder, Class B felony aggravated battery, and Class C felony battery, and the trial court merged the latter two convictions into the Class A felony conviction. The sentencing range for a Class A felony is between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years. I.C. § 35-50-2-4. At sentencing, the trial court found multiple aggravating circumstances and no mitigating circumstances, and it imposed a forty-five (45) year sentence for Harman's Class A felony attempted murder conviction.

In regard to the nature of Harman's offense, the record reveals that Harman went to Jenkins's house, claiming that he wanted to speak to Jenkins about one of Jenkins's sons. Suddenly, forty-seven-year-old Harman started to beat seventy-seven-year-old Jenkins in the face, knocking off Jenkins's glasses and toupee. Harman also broke a wooden chair over Jenkins. Jenkins faded in and out of consciousness as Harman beat and kicked him. When Jenkins tried to get off the ground, Harman repeated, "lay there and die, you son of a bitch, you're dead, you're dead." (Tr. 314). Harman then continued to hit and kick Jenkins. As Jenkins tried to get up, Harman "slic[ed]" Jenkins's throat from ear to ear. (Tr. 315). Even as Jenkins's "blood was shooting everywhere," Harman repeated, "you're dead, you son of a bitch, lay there and die." (Tr. 315). The trial court found that the "brutal" nature of the offense was a "significant" aggravating factor. (Tr. 944, 945).

As to Harman's character, the record reveals that Harman has a criminal history that includes a Class D felony aggravated driving while intoxicated conviction in Illinois

16

in 2000, a misdemeanor operating a vehicle while intoxicated conviction in Indiana in 2007, and a reckless driving infraction in Indiana in 2008. The presentence investigation report also indicates that Harman has various arrests, including arrests for domestic violence, driving under the influence of alcohol, and driving on a suspended license. Furthermore, as the trial court discussed during the sentencing hearing, Harman's character can also be seen by the fact that he chose to attack a "physically infirm[]" man who was thirty years older and sixty pounds lighter than Harman. (Tr. 946). Finally, we note that Harman has failed to include the last three pages of his presentence investigation report, which are the pages that include information on his alcohol/drug use and his mental and physical states. During the sentencing hearing, however, the State discussed these pages and mentioned that Harman had issues with his temper and had been in alcohol and drug rehab in the 1980's.

Harman has not persuaded us that that his sentence is inappropriate. Therefore, we affirm the trial court's sentence.

Affirmed.

MATHIAS, J., and BRADFORD, J., concur.