## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 11 2015, 6:33 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jonathan R. Sichtermann
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ishmell Neal Garrett,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 11, 2015

Court of Appeals Case No.
45A03-1501-CR-32

Appeal from the Lake Superior
Court.
The Honorable Samuel L. Cappas,
Judge.
Cause No. 45G04-1207-FA-17

**Darden, Senior Judge**

## Statement of the Case

Ishmell Neal Garrett appeals his convictions by jury of three counts of child molesting, two as Class A felonies, one as a Class C felony;[1] and, two counts of sexual misconduct with a minor, one as a Class B felony and one as a Class C felony.[2] He also appeals the aggregate ninety-year sentence imposed by the trial court. We affirm.

## Issues

Garrett raises two issues, which we restate as:

I. Whether there is sufficient evidence to sustain his convictions.

II. Whether Garrett's sentence is inappropriate in light of the nature of the offenses and Garrett's character.

## Facts and Procedural History

During the course of the trial, the ensuing facts and evidence were revealed. Garrett married Jessica Brawley, who had a three-year-old daughter, A.G., from a previous relationship. Garrett was A.G.'s primary father figure. He signed A.G.'s birth certificate as her father, and she called him "Dad." Tr. p. 65. Garrett had three children from a prior relationship, including a daughter,

---

[1] Ind. Code § 35-42-4-3 (1998). The General Assembly amended this statute in 2007, which was within the range of dates in which the State alleged the second count of Class A felony child molestation occurred. The 2007 amendment of the statute is not material to this case.

[2] Ind. Code § 35-42-4-9 (2007).

Stephanie. In addition, Garrett and Jessica had four children after they married.

[4]  When A.G. was younger, Garrett called her "baby" or "boo," among other nicknames. *Id.* at 70. As she got older, Garrett also called her "sexy" or "jugs," in reference to her breasts. *Id.* at 70, 205. He did not have nicknames for any of the other children. He also bought her gifts as she got older, including movies and knives. Garrett did not buy similar gifts for his other children. Once, Garrett asked his half-sister, Shannon Lehmann, to tell his children that she had bought a DVD for A.G. when in fact he was the purchaser. Later, Garrett taught A.G. how to drive, but he did not teach any of his other children how to drive.

[5]  When A.G. was eleven, the family lived at a home on Colfax Street in Gary, Indiana. Garrett began groping A.G.'s breasts, both over and under her clothes. This happened too many times for A.G. to remember an exact count. Garrett also penetrated her vagina with his fingers numerous times. Eventually, Garrett forced her to submit to him performing oral sex on her. On several occasions during this period of time, A.G. woke up to find Garrett lying next to her, once with his pants down and his penis exposed.

[6]  Garrett attempted to joke with A.G. about his sexual activities with her; but, he also threatened her not to tell anyone else. He specifically told A.G. that she should not tell her mother about his molestations because "[her mother] wouldn't care and she would believe him over [A.G.]." *Id.* at 33. Garrett also

repeatedly told her that they were not blood relatives "so he was not doing anything wrong." *Id.* at 65. A.G. was scared, confused, and hurt because she viewed Garrett as her father.

[7]  Lehmann, who considered herself to be A.G.'s aunt, also noticed that A.G.'s parents quit allowing A.G. to visit her during this period of time. Previously, A.G. was allowed to spend the night at Lehmann's house and go on trips with her. However, Stephanie continued to be allowed to spend the night with Lehmann, unless Lehmann also requested that A.G. be allowed to come over. These events "raised a red flag" to Lehmann. *Id.* at 148. Stephanie also noticed that A.G. was never allowed to go visit Lehmann or to spend the night at friends' homes.

[8]  When A.G. was twelve, the family moved to Kentucky. Garrett continued to fondle A.G.'s breasts and insert his fingers in her vagina. He also continued to force A.G. to submit to oral sex from him; and, eventually he began requiring her to perform oral sex on him.

[9]  In addition, Garrett's attitude toward A.G. changed. He stopped joking with her about his sexual activities with her. When she objected to engaging in sexual activities with him, he disregarded her objections and continued. A.G. noticed that Garrett became "way more controlling and possessive" as she got older. *Id.* at 38. Stephanie noticed that Garrett would "get mad" when A.G. attempted to go outside and play with other children, but the other children were allowed to go outside without restrictions. *Id.* at 183. He wanted to keep

her with him all the time. Garrett would arrange to send Jessica to run errands so that he could be alone with A.G.

[10] On one occasion while they lived in Kentucky, Garrett found a note A.G. had received from a friend at school. The friend stated that a boy thought A.G. was "cute." *Id.* at 39. Garrett became upset, and he and A.G. argued about the note. He called her a "slut." *Id.* at 40. Garrett had a trucking job at the time, and he took A.G. with him on a trip soon after they argued about the note. During the trip, while they were in the tractor-trailer, Garrett forced A.G. to submit to vaginal sexual intercourse for the first time, despite her repeated protests and crying.

[11] After that incident, A.G. mostly stayed in her room, slept a lot, and ate less and less. She also began cutting her arm with a knife periodically and drinking alcohol. Garrett bought vodka or alcoholic lemonade for her, Jessica, and A.G.'s older siblings on several occasions. He continued to force her to submit to genital touching, oral sex, and "two or three" more incidents of vaginal intercourse in Kentucky. *Id.* at 92. On her thirteenth birthday, Garrett referred to the day as "our anniversary" and forced her to allow him to perform oral sex on her. *Id.* at 44.

[12] When A.G. was thirteen, the family moved back to Gary, Indiana, to a small house on Hovie Street. A.G. slept in the front room of the house, and her siblings stayed at a relative's home nearby. Lehmann visited the house frequently, and she once saw A.G. and Garrett in bed together, with Garrett

embracing A.G. Stephanie also saw A.G. and Garrett in bed together. Garrett did not lie down in bed with any of the other children.

[13] Garrett continued to touch A.G.'s breasts over and under her clothes while they lived at the Hovie Street house. He also continued to insert his fingers in her vagina. Garrett repeatedly required A.G. to allow him to perform oral sex on her, and he forced her to perform oral sex on him. Because there were so many incidents of molestation, A.G. could not remember the exact number of times she was required to perform oral sex on Garrett. However, he frequently demanded oral sex from her in exchange for allowing her to go play with her siblings or to go other places. Garrett also had vaginal sexual intercourse with her, as many as "thirty" times during the period they lived in the house on Hovie Street. *Id.* at 102. On one occasion, Garrett attempted to insert his penis in A.G.'s anus, despite her crying and telling him no; but, he was interrupted only when Jessica called to say she was returning home from running errands.

[14] A.G. threatened to tell her mother about Garrett's attempt to force her to submit to anal sex. Garrett responded that "he would talk to [Jessica] first and that she wouldn't believe [A.G.] and even if [A.G. told Jessica,] we had or she had nowhere to go." *Id.* at 53. A.G. thought that Jessica had once seen Garrett trying to force A.G. to give him oral sex, but nothing happened because Jessica fought with A.G. "all the time." *Id.* at 54. A.G. felt as though Jessica blamed her for Garrett's misconduct and she "had no one [else] to tell" or to turn to. *Id.* at 54.

[15] Garrett also told A.G. several times that if she reported his sexual assaults, "they would separate us, separate the kids and I would never see my family again." *Id.* at 52. Garrett once also threatened to take A.G. "to the woods and chain [her] up and [she] won't see nobody else and it will just be you and me." *Id.* at 53.

[16] The family next moved to a house on Hobart Street in Gary, Indiana. Lehmann again saw Garrett in bed with A.G. Garrett continued to force A.G. to submit to vaginal sexual intercourse, perhaps as many as "twenty" times while they lived at the house on Hobart Street, and he continued to touch her breasts and vagina. *Id.* at 106.

[17] The family next moved to Tennessee, the day after Lehmann called the police to express concerns about Garrett and A.G. In Tennessee, Garrett's conduct towards A.G. was "real bad" because Jessica had gotten a job and while she was at work, "everything was happening [at home]." *Id.* at 57. Garrett continued to perform oral sex on A.G., forced her to perform oral sex on him, continued to insert his fingers in her vagina, and forced her to submit to vaginal sexual intercourse about "fifteen" times. *Id.* at 110. Once, A.G.'s three or four-year-old brother saw Garrett attempting to coerce A.G. to perform oral sex on Garrett and became very upset. Garrett made A.G. go find her brother and calm him down while Garrett went to sleep.

[18] Later, Lehmann reported Garrett to a Tennessee child welfare department agency while the family was living in that state, and the police went to their

house. Garrett instructed all of the kids not to say anything, and he specifically threatened A.G. that if she said anything, she would never see her siblings again and would grow up "not knowing where anybody was." *Id.* at 127. Investigators questioned A.G. by herself for forty minutes, but she did not tell them anything because she "was really scared." *Id.* at 60.

[19] The family then moved to Alabama when A.G. was fifteen. Garrett forced A.G. to submit to vaginal sexual intercourse twice while living there. The sexual assaults finally stopped because A.G. resisted Garrett and began to physically fight him. A.G.'s siblings were not aware that Garrett was molesting A.G., but when Garrett and A.G. argued, Stephanie and her older brother began to intercede. During this period of time, Garrett and A.G. once argued when he was driving them home. When A.G. told Garrett that "[she] didn't love him like that," he became upset and pretended he was going to crash his truck into the house. *Id.* at 63. Stephanie saw Garrett drive the truck towards the carport at a high rate of speed, but he stopped just before hitting the house. Afterwards, Stephanie found A.G. lying on the truck's floorboard, "rocking back and forth, crying, asking [Stephanie] to help her." *Id.* at 196.

[20] Next, the family moved back to Gary. A.G. had stopped cutting herself by then, but she had started to drink alcohol heavily and smoke marijuana. The Indiana Department of Child Services (DCS) became involved with the family and removed A.G. and one of her brothers from the home due to "deplorable living conditions and educational neglect." *Id.* at 351.

[21] DCS initially placed A.G. and her brother in a youth home, with supervised visitation by her parents. A.G.'s therapist attended visitation and noticed that Garrett frequently had whispered conversations with A.G., in violation of the rules. Garrett did not have such conversations with Jessica or his son, who were also present. Furthermore, during meetings with the family to discuss possible reunification, the therapist noted that Garrett always sat next to A.G. rather than Jessica. Typically, parents sit together in those meetings.

[22] Next, A.G. went to live with Lehmann's family. When A.G. first arrived at Lehmann's home, Garrett called A.G. and kept her "on the phone all the time," to the point that it disrupted Lehmann's family life. *Id.* at 172. In addition, A.G. was distressed by the calls and asked Garrett to leave her alone. The phone calls stopped only after Lehmann complained to DCS. In May 2012, A.G. disclosed to her therapist that Garrett had molested her. A.G. was still in therapy as of the time of trial, over two years after first disclosing Garrett's molestations.

[23] A.G. underwent a sexual assault examination by Dr. Edwin Udari. He determined that her hymen was damaged in a manner that was "suspicious for sexual abuse." *Id.* at 137.

[24] The State charged Garrett with three counts of child molesting, two as Class A felonies and one as a Class C felony, and two counts of sexual misconduct with a minor, one as a Class B felony and one as a Class C felony. A jury determined that he was guilty as charged.

The trial court sentenced Garrett to forty-five years on each Class A felony conviction, to be served consecutively. The trial court further sentenced him to fifteen years for the Class B felony and seven years for each Class C felony, all to be served concurrently with one of the Class A felony convictions, for an aggregate sentence of ninety years. This appeal followed.

# Discussion and Decision

## A. Sufficiency of the Evidence

When we review the sufficiency of the evidence to support a criminal conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Buelna v. State*, 20 N.E.3d 137, 141 (Ind. 2014). We neither reweigh the evidence nor assess witness credibility. *Id.* We will affirm the conviction unless no reasonable factfinder could conclude the elements of the crime were proven beyond a reasonable doubt. *Id.*

In order to convict Garrett of child molesting as a Class A felony, the State was required to prove beyond a reasonable doubt that: (1) Garrett; (2) a person at least twenty-one years of age; (3) performed or submitted to sexual intercourse or deviate sexual conduct; (3) with A.G.; (4) a child under fourteen years of age. Ind. Code § 35-42-4-3(a). In order to convict Garrett of child molesting as a Class C felony, the State was required to prove beyond a reasonable doubt that: (1) Garrett; (2) with A.G.; (3) a child under fourteen years of age; (4) performed or submitted to any fondling or touching, of either A.G. or Garrett;

(5) with intent to arouse or satisfy the sexual desires of either A.G. or Garrett. Ind. Code § 35-42-4-3(b).

[28] In order to convict Garrett of sexual misconduct with a minor as a Class B felony, the State was required to prove beyond a reasonable doubt that: (1) Garrett; (2) a person of at least twenty-one years of age; (3) performed or submitted to sexual intercourse or deviate sexual conduct; (4) with A.G.; (5) a child at least fourteen years of age but less than sixteen years of age. Ind. Code § 35-42-4-9(a). In order to convict Garrett of sexual misconduct with a minor as a Class C felony, the State was required to prove beyond a reasonable doubt that: (1) Garrett; (2) a person of at least twenty-one years of age; (3) with A.G.; (4) a child of at least fourteen years of age but less than sixteen years of age; (5) performed or submitted to any fondling or touching, of either A.G. or Garrett, with intent to arouse or satisfy the sexual desires of either A.G. or Garrett. Ind. Code § 35-42-4-9(b).

[29] At the time Garrett committed his crimes, deviate sexual conduct was defined in relevant part as an act involving the sex organ of one person and the mouth or anus of another person. Ind. Code § 35-41-1-9 (repealed 2012).

[30] Garrett does not challenge the evidence supporting any specific elements of the offenses. Instead, he claims that this was essentially a "he said/she said" case; that no one else witnessed any sexual conduct between Garrett and A.G.; and, that A.G. did not allege that Garrett molested her until years after it stopped.

Appellant's Br. p. 8. He thus concludes that the evidence is insufficient to support his convictions.

[31] A victim's testimony, even if uncorroborated, is ordinarily sufficient to sustain a conviction for child molesting. *Bowles v. State*, 737 N.E.2d 1150, 1152 (Ind. 2000). At the time of trial, A.G. was a nineteen-year-old college student. She testified in great detail about Garrett's repeated molestations from the time she was eleven until well after she turned fourteen. A.G. remembered being forced to perform and submit to oral sex with Garrett, being forced to submit to Garrett fondling her breasts and penetrating her vagina with his fingers, and, later, being forced to submit to vaginal sexual intercourse with Garrett. A.G. specifically tied those acts to addresses at which she lived in Gary, Indiana, and she told the jury how old she was when she lived in the Indiana locations. Her testimony was in all material respects clear and unequivocal. Furthermore, there was no dispute that Garrett was older than twenty-one years of age during the time period relevant to this case.

[32] Moreover, other witnesses corroborated aspects of A.G.'s testimony. A sexual assault examination revealed that A.G.'s hymen was damaged in a manner that was consistent with sexual abuse. A.G.'s sister, Stephanie, and A.G.'s aunt, Shannon Lehmann, testified that Garrett treated A.G. differently than his other children by buying her special gifts and giving her special nicknames. Stephanie and Lehmann saw Garrett embracing A.G. in bed, but Garrett never shared a bed with his other children. Stephanie and Lehmann also noted that Garrett consistently isolated A.G. from others, preventing her from leaving the

house without Garrett or from playing outside with siblings and other children. Lehmann noticed that A.G.'s personality changed, stating "she was just really sleeping all the time [when the family lived in Kentucky]." Tr. p. 151. A.G.'s therapist indicated that Garrett's controlling behavior continued even after DCS removed A.G. from Garrett's household.

[33] Regarding A.G.'s delayed disclosure of the abuse, Detective John Gruszka, who was trained to interview child sex abuse victims and had interviewed A.G., told the jury that delayed disclosure is common in child sex abuse cases. In addition, A.G.'s delay is understandable because the record reflects Garrett's repeated threats to keep her silent and his efforts to limit her interactions with people outside of the family.

[34] Garrett's challenges to A.G.'s testimony are essentially requests to reassess A.G.'s credibility, which our standard of review forbids. The jury was in the best position to weigh A.G.'s testimony and observe her demeanor. There is sufficient evidence to sustain Garrett's five criminal convictions. *See Bowles*, 737 N.E.2d at 1152 (child victims' testimony sufficient to sustain child molest convictions where victims testified to specific instances of molestation and their testimony lacked material inconsistencies).

## B. Appropriateness of Sentence

[35] Article seven, section four of the Indiana Constitution authorizes Indiana's appellate courts to review and revise sentences. That authority is carried out through Indiana Appellate Rule 7(B), which allows an appellate court to revise

a sentence that is otherwise authorized by statute if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

[36] The principal role of appellate review under Rule 7(B) is to attempt to leaven the outliers, not to achieve a perceived "correct" result in each case. *Garner v. State*, 7 N.E.3d 1012, 1015 (Ind. Ct. App. 2014). Thus, the key question is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed in the instant case is inappropriate. *Williams v. State*, 997 N.E.2d 1154, 1165 (Ind. Ct. App. 2013).

[37] It is the defendant's burden to persuade us that the sentence imposed by the trial court is inappropriate. *Id.* Whether a sentence is inappropriate depends upon the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that are present in a given case. *Harman v. State*, 4 N.E.3d 209, 219 (Ind. Ct. App. 2014), *trans. denied*.

[38] At the time Garrett committed his crimes, the advisory sentence for a Class A felony was thirty years, the minimum sentence was twenty years, and the maximum sentence was fifty years. Ind. Code § 35-50-2-4 (2005). The advisory sentence for a Class B felony was ten years, the minimum sentence was six years, and the maximum sentence was twenty years. Ind. Code § 35-50-2-5 (2005). Furthermore, the advisory sentence for a Class C felony was four years, the minimum sentence was two years, and the maximum sentence was eight years. Ind. Code § 35-50-2-6 (2005).

[39] The trial court sentenced Garrett to less than the maximum sentence for each crime. The court sentenced Garrett to forty-five years for each Class A felony, fifteen years for the Class B felony, and seven years for each Class C felony. The trial court further ordered Garrett to serve the sentences for the Class A felonies consecutively to one another, and the remaining sentences to be served concurrently with one of the Class A felony sentences, for an aggregate sentence of ninety years, well short of the maximum possible sentence of one hundred and thirty-six years.

[40] Turning to the nature of Garrett's crimes, they are brutal. Garrett was A.G.'s father for all intents and purposes, and she called him "Dad." He groomed A.G. for a sexual relationship from a very young age. Once she turned eleven, he began to fondle her breasts, penetrated her vagina with his fingers, and forced her to submit to oral sex from him. He began isolating her from outsiders, limiting her freedom of movement and keeping her by his side whenever possible.

[41] Garrett also implemented a years-long campaign of psychological bribery, intimidation, and coercion against A.G., telling her repeatedly that what they were doing was fine because they were not blood relatives. He also said that A.G.'s mother did not care about her and would do nothing even if A.G. told. Garrett also repeatedly told A.G. that if she told anyone, child welfare authorities would split up the family, and she would never see her siblings again.

[42]     As A.G. grew older (but was still a child), over the course of several years the incidents of sexual molestation happened so often that she lost exact count of how many times they happened. Garrett repeatedly forced her to perform oral sex on him and to submit to vaginal sexual intercourse, even as she cried and said no. He also attempted to anally penetrate A.G. on one occasion, desisting only when A.G.'s mother called to say she was on her way home.

[43]     Even after Lehmann reported the family to Tennessee's child welfare department agency, Garrett intimidated A.G. into lying to authorities about the abuse. Finally, after almost four years and multiple moves across state lines, Garrett ended his sexual abuse only after A.G. physically fought back and her siblings intervened and stood up to him on her behalf. He had ample opportunity to reconsider his earlier criminal acts, but he instead doubled down in his criminal behavior. Garrett became more persistent, abusive, demanding, and controlling as time went on.

[44]     Garrett's physical and psychological abuse of A.G. had a drastic effect on her personality and mental health. She cut herself on the arm multiple times over a span of years. A.G. became depressed, sleeping a lot and eating less and less. She also increased her usage of alcohol, some of which was supplied by Garrett, and used marijuana beginning at age twelve or thirteen. Finally, A.G. was not able to disclose the abuse she had suffered until after she was completely removed from Garrett's influence. She had been in therapy for years after disclosing the abuse and remained in therapy at the time of Garrett's trial. The nature of the offenses alone renders Garrett's sentence appropriate.

[45] Turning to the character of the offender, Garrett argues that he deserves credit for not having a criminal record. In general, the absence of a criminal record is a mitigating circumstance. Here, however, the record reflects that Garrett sexually abused A.G. at every opportunity over a span of years, commencing when she was only eleven and escalating in severity as she grew older in age. He could have faced additional molestation charges in Indiana, as well as molestation charges in three other states (Kentucky, Tennessee, and Alabama). Garrett also frequently purchased alcohol for A.G. and her older (but still underage) siblings. Garrett repeatedly stymied attempts by police and child welfare agencies in several states to investigate his children's well-being, including leaving Indiana the day after his family was reported to the police and instructing the children (and threatening A.G.) to lie to Tennessee investigators. Under these circumstances, Garrett's lack of a criminal record is not grounds for reducing his sentence. *See Couch v. State*, 977 N.E.2d 1013, 1017-18 (Ind. Ct. App. 2012) (defendant's lack of prior criminal convictions outweighed by extensive evidence of multiple uncharged child molestations), *trans. denied*.

[46] Garrett, who was forty-two at the time of sentencing, argues that he has been given, in substance, a life sentence with no chance for rehabilitation. We are mindful of our duty to leaven sentencing outliers, and under the facts of this case Garrett has failed to establish that his ninety-year sentence is inappropriate. *See Williams*, 997 N.E.2d at 1166 (ninety-year sentence for multiple child-molesting convictions not inappropriate where defendant

repeatedly had sexual intercourse with his young daughter over several years, up to five times per week, and bribed and threatened her to keep her silent).

## Conclusion

[47] For the foregoing reasons, we affirm the judgment of the trial court.

[48] Affirmed.

Robb, J., and Mathias, J., concur.