# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 13 2018, 6:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

David J. Harman
Pendleton, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

David J. Harman,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

March 13, 2018

Court of Appeals Case No.
45A03-1707-PC-1685

Appeal from the Lake Superior Court

The Honorable Kathleen A. Sullivan, Judge Pro Tempore

Trial Court Cause No.
45G02-1411-PC-10

**Mathias, Judge.**

[1] David J. Harman ("Harman") appeals the post-conviction court's denial of his petition for post-conviction relief. Harman raises three issues for our review which we restate as:

  I. Whether the post-conviction court abused its discretion when it refused to issue subpoenas for the jury foreman and a detective who testified at Harman's trial;[1]

  II. Whether Harman received ineffective assistance of trial counsel; and

  III. Whether Harman received ineffective assistance of appellate counsel.

[2] We affirm.

## Facts and Procedural History

[3] A panel of this court set forth the facts and initial procedural history pertaining to Harman's attempted murder conviction as follows:

> In May 2011, Harman, who was nicknamed "Red," was dating Cathy Jenkins ("Cathy"), who had previously been married to J.R. Jenkins ("Jenkins"). Jenkins and Cathy, who divorced in 2007, had two sons, Joe and A. Jenkins lived on Oakdale Avenue in Hammond, Indiana, and A. lived with him. Cathy and Joe lived with Cathy's mother in Illinois. At times, Cathy stayed with Harman, who lived with his mother in Illinois. Cathy and Harman also stayed sometimes with Cathy's friend, Lori

---

[1] Harman also argues that the post-conviction court abused its discretion when it did not certify its order denying subpoenas for interlocutory appeal. However, as the State points out in its brief, this issue is now moot. *See* Appellee's Br. at 16–17 n.1; *Mosley v. State*, 908 N.E.2d 599, 603 (Ind. 2009) ("The long-standing rule in Indiana courts has been that a case is deemed moot when no effective relief can be rendered to the parties before the court.").

Jones ("Jones"), and Jones's fiancé, Kevin Hanshew ("Hanshew"), who lived in Highland, Indiana.

On May 31, 2011, Harman was doing yard work for Hanshew and Jones at their house in Highland. That afternoon, while Jones was out running an errand, Harman asked Hanshew to drive him to Hammond. Harman directed Hanshew on where to drive and had him park in an alley near Jenkins's house. Harman told Hanshew that he would be gone "a couple of minutes." (Tr. 135). Hanshew waited twenty minutes and then left because he was hot.

During this time, Harman went to Jenkins's house and asked to speak to him about Jenkins's older son, Joe. Jenkins invited Harman in, and they sat at the kitchen table. As they were talking, forty-seven-year-old Harman "sprung out with his left hand" and hit seventy-seven-year-old Jenkins in the face, knocking off Jenkins's glasses and toupee. (Tr. 313). Harman then started "beating" Jenkins. (Tr. 313). As Jenkins was "slumped down . . . against the wall and the table," Harman "busted" a "heavy duty" wooden chair over Jenkins. (Tr. 314). When Jenkins tried to get off the ground, Harman repeated, "lay there and die, you son of a bitch, you're dead, you're dead" and "[l]ay there and die, you son of a bitch, you're worth more to us dead than you are alive." (Tr. 314). Harman continued to hit and kick Jenkins. Then, as Jenkins was trying to get up, Harman "slic[ed]" Jenkins's throat with some sort of sharp object. (Tr. 315). Harman cut Jenkins's throat with such force that he cut "through skin, muscle and into [his] thyroid cartilage." (Tr. 92). As Harman cut him, Jenkins asked Harman, "Red what the F are you doing [?]" (Tr. 315). Jenkins saw that his "blood was shooting everywhere" and heard Harman repeating, "you're dead, you son of a bitch, lay there and die." (Tr. 315). Jenkins then lost consciousness.

Thereafter, Harman called Hanshew, who was "almost halfway home" to Highland, and asked Hanshew to pick him up. (Tr. 137). As Hanshew drove on Oakdale Avenue, Hanshew saw Harman "beating and kicking" an older man on a porch. (Tr. 138). When Hanshew saw that the man being beat had "blood all over" him, Hanshew kept driving and returned to his house. (Tr. 139). Harman then called Jones, yelling that Hanshew had left him, and asked her to pick him up in Hammond. After Jones dropped Harman back at the house, he took a shower, washed his clothes, and threw away his boots.

Meanwhile, Jenkins regained consciousness and was able to get up and eventually make his way to the house of Janet (a/k/a Jackie) Jenkins ("Jackie"), who lived a few houses down from him. When Jenkins went in Jackie's house, he was weak and "his neck was bleeding profusely." (Tr. 416). Jackie sat him on the sofa, put a towel on his neck, and called the paramedics. When Jackie asked Jenkins who had hurt him, he responded, "Red, Cathy's boyfriend[.]" (Tr. 317). Jenkins then lost consciousness due to his blood loss.

Later in the evening, Cathy arrived at Jenkins's house to drop off A. When she arrived, she saw the police and police tape around Jenkins's house. Cathy then went to the police station to speak to the police. Thereafter, Cathy called Jones to tell her that she would be delayed in getting to Jones's house and informed Jones about what happened at Jenkins's house with the police. After Jones got off the phone, she went into the bedroom where Harman was sleeping, hit him on his feet, and asked "what did you do[?]" (Tr. 236). Harman responded, "I kicked the shit out of him, I should've f[***]ing killed him." (Tr. 236).

Jenkins was initially taken to a local hospital but was then airlifted to a hospital in Illinois due to the traumatic nature of his injuries. Jenkins suffered a subdural hematoma, a neck fracture, and an "extremely large and deep neck wound." (Tr. 75).

Jenkins's neck wound stretched "clear across his neck" and was so deep that his trachea was cut. (Tr. 79). Jenkins's neck laceration was so "extensive" that the trauma surgeon described it as "filleted." (Tr. 79). Jenkins's injuries caused him to undergo a "traumatic arrest" where his loss of a large amount of blood caused his heart to stop. (Tr. 76). Jenkins spent a total of approximately two months in the hospital due to his injuries and complications from them. For a time, Jenkins was unable to talk and had to have a tracheostomy tube and a feeding tube.

On June 7, 2011, police officers went to the hospital to interview Jenkins. Jenkins, who was unable to speak because of his tubes, identified Harman as the perpetrator of the crime against him by writing the name "Red" on a piece of paper. Thereafter, the State charged Harman with Count I, Class A felony attempted murder; Count II, Class B felony aggravated battery; and Count III, Class C felony battery.

The trial court held a five-day jury trial from January 28, 2013 to February 1, 2013. Prior to trial, the State filed a motion in limine, seeking to exclude evidence of Jenkins's prior convictions, arrests, and charges pursuant to Evidence Rules 401, 404(b), 608, and 609. Specifically, the State sought to preclude evidence regarding: (1) Jenkins's convictions, in Illinois in September 1979, for conspiracy to commit murder, solicitation to commit murder, and attempted murder; and (2) Jenkins's guilty plea, "sometime prior" to May 2011, to threatening Cathy on the telephone in violation of a protective order issued by an Illinois court against him and in favor of Cathy. (App. 73).

Prior to the presentation of witnesses, the trial court heard argument regarding the State's motion in limine. The State argued that the prior convictions and the protective order, which was issued as part of Jenkins['s] and Cathy's dissolution, were not relevant and would confuse the issues at trial. Harman's counsel stated that he was not planning on introducing any

evidence regarding Jenkins's 1979 criminal convictions "due to the remoteness in time" but argued that Jenkins's violation of the protective order protecting his ex-wife Cathy was "extremely relevant" because Harman was dating Cathy. (Tr. 19). The trial court granted the State's motion in limine to exclude evidence of the prior convictions and the protective order. Specifically, the trial court ruled:

> All right. The Court has an obligation to make sure that the jury hears relevant evidence and that it does not get confused or sidetracked on collateral matters or minutia that have no bearing on the case. Based on what I've heard so far, I'm granting the State's motion as to both of those issues as set forth in their motion in limine. The Court will not allow any testimony to be elicited regarding the conviction of Mr. Jenkins back in 79 or this issue of a protective order that was issued against Mr. Jenkins by a family law court in [Illinois]. If, of course, if the door's opened by Mr. Jenkins during his testimony to these issues or if there's otherwise some relevant, some relevance revealed through his testimony about these issues, then certainly the Court may reconsider it's [sic] ruling. And we will re-visit both these issues at the appropriate time during the trial as required by the rules.

(Tr. 26–27).

Harman's defense at trial focused on identification, with him contending that there was no "scientific evidence" to link Harman to the crime. (Tr. 71). During trial, prior to cross-examining Jenkins, Harman renewed his objection to the trial court's pre-trial limine ruling that he was precluded from presenting evidence regarding Jenkins's violation of the protective order entered in favor of Cathy. Also, as part of an

offer to prove, he sought to introduce a police report on the protective order violation. Harman did not renew his objection or make an offer to prove regarding the trial court's pre-trial limine ruling that he could not present evidence regarding Jenkins's 1979 convictions.

The jury found Harman guilty as charged. At sentencing, the trial court determined that there were no mitigating circumstances. The trial court found the following to be aggravating circumstances: (1) the injury suffered by the victim was greater than the elements necessary to prove the crime; (2) Harman's criminal history; (3) the age of the victim being over sixty-five years of age; (4) the nature and circumstances of the "brutal" attack against the victim; (5) Harman possessed "a violent and depraved nature[;]" and (6) Harman's lack of remorse. (App. 90). The trial court merged Counts II and III into Count I due to double jeopardy concerns, entered judgment of conviction on the attempted murder conviction only, and imposed a forty-five (45) year sentence in the Department of Correction.

*Harman v. State*, 4 N.E.3d 209, 212–15 (Ind. Ct. App. 2014) (footnotes omitted), *trans. denied.*

[4] On direct appeal, Harman claimed that the trial court erred in denying him an opportunity to make an offer to prove regarding Jenkins's violation of the protective order and by excluding evidence of Jenkins's 1979 convictions. *Id.* at 215–17. Harman also argued that the trial court abused its discretion during sentencing by failing to recognize two of his proffered mitigators and that his sentence was inappropriate under Indiana Appellate Rule 7(B). *Id.* at 217–20. We rejected Harman's claims and affirmed his conviction and sentence in a published opinion. *Id.* at 220.

[5] On September 15, 2015, Harman petitioned for post-conviction relief, which he subsequently amended on June 20, 2016, in which he claimed: (1) ineffective assistance of trial counsel, (2) ineffective assistance of appellate counsel, (3) abuse of discretion by the trial court for denying Harman's request for subpoenas, and (4) inappropriate sentence. On July 5, Harman filed a motion for assistance in serving subpoenas on his trial counsel Adam Tavitas ("Tavitas"), his appellate counsel Mark Small ("Small"), the jury foreman from his trial, and Hammond Police Department Detective Jenny Schutz ("Detective Schutz"). The court granted Harman's request to assist in serving subpoenas on Tavitas and Small, and it denied his request for the jury foreman and Detective Schutz because it did not find their expected testimony relevant. Harman then filed a motion for the court to certify its order for interlocutory appeal, which it denied.

[6] The post-conviction court held evidentiary hearings on September 20 and September 29, 2016, during which Harman questioned Tavitas and Small. The court then denied Harman's petition on July 7, 2017. In the post-conviction court's extensive order, it noted that Harman had specifically withdrawn his claims of abuse of discretion by the trial court and inappropriate sentence in his proposed findings of fact and conclusions of law, and thus the "claims are forever affirmatively waived by [Harman]." Appellant's App. p. 24. The court then methodically went through each of Harman's allegations relating to his claims of ineffective assistance of both trial and appellate counsel, and it denied Harman's petition for post-conviction relief.

Harman now appeals.

## Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Willoughby v. State*, 792 N.E.2d 560, 562 (Ind. Ct. App. 2003), *trans. denied*. When a petitioner appeals the denial of a petition for post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id*. On appeal, we do not reweigh evidence nor judge the credibility of witness; therefore, to prevail, Harman must show that the evidence in its entirety leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*. Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post–Conviction Rule 1(6), we do not defer to the court's legal conclusions, but the "findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Henley v. State*, 881 N.E.2d 639, 644 (Ind. 2008).

## Denial of Harman's Requests for Subpoenas

Harman contends that the post-conviction court abused its discretion when it denied his request to issue subpoenas for the jury foreman and for Detective

Schutz.[2] Specifically, Harman alleges that there was a "conspiracy to convict" him, and an effort to portray him as an "outlaw biker" by the prosecutor's office, investigating officers, and witnesses. Appellant's Br. at 11–12. And "Detective Jenny Schutz was subpoenaed to question her concerning her investigation of the case and this conspiracy. The jury foreman was subpoenaed to question concerning the effect of the 'outlaw biker' harpooning upon the jury." *Id.* at 12.

[10]    A pro se petitioner's request for issuance of subpoenas falls under Indiana Post-Conviction Rule 1(9)(b) which states in relevant part:

> If the pro se petitioner requests issuance of subpoenas for witnesses at an evidentiary hearing, the petitioner shall specifically state by affidavit the reason the witness'[s] testimony is required and the substance of the witness'[s] expected testimony. If the court finds the witness'[s] testimony would be relevant and probative, the court shall order that the subpoena be issued. If the court finds the proposed witness'[s] testimony is not relevant and probative, it shall enter a finding on the record and refuse to issue the subpoena.

The decision to grant or deny a request for issuance of a subpoena is within the post-conviction court's discretion. *Collins v. State*, 14 N.E.3d 80, 84 (Ind. Ct.

---

[2] We acknowledge that the post-conviction court found this issue waived. Appellant's App. p. 24. However, because Harman advanced the issue in both his amended petition for post-conviction relief and his brief, we choose to address it.

App. 2014). An abuse of discretion occurs where the court's decision is against the logic and effect of the facts and circumstances before it. *Id.*

[11] Harman alleged in his affidavit that the jury foreman would testify to "[t]he influence of extraneous prejudicial information" that "was improperly brought to the jury's attention in rendering the guilty verdict." Appellant's App. p. 109. The "extraneous prejudicial information" is that the State allegedly painted Harman as an "Outlaw Biker," and the jury found him guilty as a result. *Id.* We disagree.

[12] We initially note that there is no record of the word "outlaw" being used even once during Harman's five-day jury trial, and there are only three mentions of the word "biker."[3] Harman consistently argues in his brief that the State attempted to paint him to the jury as an "outlaw biker" during trial, but this argument is wholly unsupported by the record.

[13] Regarding the jury foreman, Indiana Evidence Rule 606(b)(1) explains that "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."

---

[3] The first mention of the word "biker" is by the State in its opening argument where it references testimony it expects to elicit from Lori. Trial Tr. Vol. 2, p. 65. The second use of the word "biker" is in Lori's testimony that the State referred to in its opening argument. There, Lori testified that Harman stated to her "once a biker bitch always a biker bitch." Trial Tr. Vol. 3, p. 240. The third time "biker" appears in the record is in an exhibit proffered by Harman which is a letter Harman's former employer wrote to the judge on Harman's behalf. In that letter Harman's former employer writes, "[Harman] does have a tendency to don bikers garb and styles, but he likes the image it presents and is part of why he is well liked." Ex. Vol. 8, Defendant's Ex. C.

Harman contends that the jury foreman's testimony would fall under an exception to Rule 606(b)(1) which allows a juror to testify about whether "extraneous prejudicial information was improperly brought to the jury's attention." Evid. R. 606(b)(2)(B). However, the evidence Harman complains of was not extraneous because it *was* explicitly brought in at trial. Thus, the jury foreman here would not have been allowed to testify. Harman maintains "that extraneous evidence harpooning was presented to the jury by the State and Evidence Rule 606 as follows allowed this jury to testify[.]" Reply Br. at 6. But Harman does not point to any extraneous evidence, and therefore, the trial court's refusal to issue a subpoena for the jury foreman was not an abuse of discretion.

[14] Harman expected Detective Schutz to testify to "[h]er investigation in this case concerning interviewing witnesses, searching for and the evidence used in this case, and prior to this trial [] any previous contact with [Harman]." Appellant's App. p. 111. But Detective Schutz already testified about all of this at trial, *see* Trial Tr. Vol. 4, pp. 712–15;[4] Trial Tr. Vol. 5, pp. 716–93, and the post-conviction court admitted Harman's direct appeal record into evidence. Post-Conviction Tr. p. 12. In his affidavit, Harman did not explain how Detective Schutz's testimony would be any different from the testimony she provided at his trial, and thus the post-conviction court was not provided any reason why

---

[4] These four pages mistakenly appear before page 561 in Volume 4 of the trial transcript.

the detective's testimony would be relevant or probative. As a result, the court's refusal to issue a subpoena for Detective Schutz was not an abuse of discretion.

## Ineffective Assistance of Trial Counsel

[15] Harman contends his trial counsel was ineffective for several reasons. A claim of ineffective assistance of trial counsel requires a showing that: (1) Harman's trial counsel's performance was deficient by falling below an objective standard of reasonableness; and (2) that the deficient performance prejudiced Harman such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Failure to satisfy either of the two elements will cause the claim to fail. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002). "Isolated mistakes, poor strategy, or bad tactics do not necessarily amount to ineffective assistance of counsel." *Herrera v. State*, 679 N.E.2d 1322, 1326 (Ind. 1997) (citations omitted). We address each of Harman's contentions as to why his trial counsel was ineffective in turn.

### I. Failure to Investigate

[16] Harman's first claim is that his trial counsel was ineffective for failing to investigate Jenkins's criminal history, a protective order Cathy had against Jenkins, and an anonymous telephone call. The Supreme Court explained in *Strickland*, "In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 690–91.

*A. Jenkins's Criminal History*

The State filed a motion in limine seeking to exclude evidence that Jenkins had been convicted of crimes in Illinois, including attempted murder in 1979. Tavitas indicated that he had investigated Jenkins's criminal history and explained, "those convictions are extremely old[,] and I was not planning on bringing those, due to the remoteness in time and the case law that I saw[.]" Trial Tr. Vol. 2, p. 19. Under Indiana Evidence Rule 609(b)(1), evidence of a criminal conviction over ten years old is admissible only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Harman has not provided specific facts or circumstances as to any probative value of Jenkins's nearly forty-year-old attempted murder conviction that would outweigh its prejudicial effect.

Harman argues that his counsel should have brought the prior conviction in at trial under Indiana Evidence Rule 609(a) in order to "impeach Jenkins at trial." Appellant's Br. at 13. However, this would not have aided Harman in his mission to use the conviction to show Jenkins's propensity for violence or to provide evidence that "whoever committed this crime more than likely had to defend himself." *Id.* Even if Tavitas proffered the conviction for impeachment purposes, it would not be admissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Ind. Evidence Rule 404(b)(1). *See also, e.g., Sisson v. State*, 985 N.E.2d 1, 16–17 (Ind. Ct. App. 2012), *trans. denied.*

[19]     Harman has failed to show how Jenkins's conviction made him any less credible or how attacking his credibility with the conviction would have affected the outcome at trial. Moreover, the State presented overwhelming evidence to corroborate Jenkins's testimony, including his own confession to Jones in which Harman told her, "I kicked the shit out of him, I should've f[***]ing killed him." Trial Tr. Vol. 3, p. 236.

### B. The Protective Order

[20]     The State also moved in its motion in limine to exclude evidence that Cathy had a protective order against Jenkins. Tavitas objected to the State's motion and argued that the protective order "is extremely relevant" because it "may be one of the reasons why [Jenkins's] ex-wife Cathy [] actually had Mr. Harman supposedly injure him." Trial Tr. Vol. 2, pp. 19, 24. The State granted the State's motion to exclude the protective order. However, during trial, Tavitas asked to bring up the protective order during his cross-examination of Jenkins, and he tried to offer a police report showing that Jenkins had violated the protective order. Trial Tr. Vol. 3, pp. 341–42, 352–59. The court ruled against Tavitas on both attempts. Thus Tavitas did investigate the protective order, and he did attempt to show that Jenkins had violated it.

[21]     Moreover, any evidence of Cathy's protective order against Jenkins and his violation of it would not have been admissible "to establish Jenkins was the initial aggressor in this case and previously had a propensity and history of violence." Appellant's Br. at 14; *see also* Evid. R. 404(b)(1). Even if it were admissible for this purpose, the fact that Jenkins violated a protective order

against Harman's girlfriend would *hurt* Harman's case by providing a motive to attack Jenkins. There is no reasonable probability that the evidence of a protective order or Jenkins's violation of it would have affected the outcome of Harman's trial.

*C. The Anonymous Call*

[22] Finally, Tavitas did investigate the police report documenting an anonymous call, and he testified that "if it was part of the discovery that was given to me, I'm certain I read it." Post-Conviction Tr. p. 18. When Harman showed Tavitas the report and explained that it was part of discovery, Tavitas explained, "I'm certain I've reviewed this before." *Id.* at 20. He continued, "[T]his appears to me that whoever made this anonymous call, and, again, I don't remember if I spoke to someone or not, would have very bad evidence against you at trial. So[,] I don't know that I wanted to speak to them if it could help prove the case against you." *Id.* at 21–22. Harman asserts that if Tavitas had investigated the anonymous call, then he could have turned the investigation on the alleged caller, Henshaw, "thus proving a third-party defense for trial." Appellant's Br. at 15. Harman's argument is without merit.

[23] Tavitas asked Henshaw at trial if he had called the police, and Henshaw stated, "It didn't even occur to me to call 911." Trial Tr. Vol. 2, p. 180. Harman maintains that Tavitas should have hired an "expert to track or trace the number and location the call was made from." Reply Br. at 8. Even assuming Tavitas had the resources to do so and discovered that Henshaw made the anonymous call incriminating Harman in the crime, this at most would have

allowed Tavitas to impeach Henshaw's testimony. It would have done nothing to negate the overwhelming independent evidence of Harman's guilt. Tavitas did investigate the anonymous phone call by examining the police report. And his decision not to pursue identifying the caller because "it would seem as if that would be very bad evidence against [Harman]," Post-Conviction Tr. p. 22, does not amount to ineffective assistance of counsel.

## II. Failure to Interview and Subpoena Character Witnesses

[24] Harman next argues that his trial counsel was ineffective for failing to "interview and subpoena witnesses to aid in his defense." Appellant's Br. at 15. Tavitas explained his decision during the post-conviction hearing when he stated, "[I]f you bring up someone's character, you kind of open the door as to potential prior bad acts, potential prior convictions. So, it's -- often times it's strategic whether it is to call a witness or sometimes to not call the witness." Post-Conviction Tr. p. 17. If Tavitas had chosen to call character witnesses, the State would have been able to cross-examine them with specific instances of Harman's conduct. *See* Ind. Evidence Rules 404(a)(2), 405. And Harman had a criminal history, *Harman*, 4 N.E. 3d at 219, thus the State would have had significant evidence from which to draw. Tavitas was not ineffective for making a strategic decision not to call character witnesses.

## III. Failure to Object to the Battery Charges

[25] Harman next contends that his trial counsel was ineffective for failing to file a motion to dismiss or object to the aggravated battery and battery charges. He alleges that "[t]hese charges were not lesser included offenses with instructions

to the jury reflecting this, so they should not have been included at trial." Appellant's Br. at 16. Harman is incorrect, because "[a]lthough a defendant charged and found guilty may not be convicted and sentenced more than once for the same offense . . . the State has unrestricted discretion to file alleged repetitive charges." *Marshall v. State*, 590 N.E.2d 627, 631 (Ind. Ct. App. 1992), *trans. denied*. And when this happens, the trial court should "vacate the conviction with the less severe penal consequences," *Richardson v. State*, 717 N.E.2d 32, 55 (Ind. 1999), which is exactly what it did here.

[26] The trial court did not enter judgment on Harman's aggravated battery and battery convictions. Trial Tr. Vol. 5, p. 909; Appellant's App. p. 10. He merged the battery counts into the attempted murder count and only entered a judgement of conviction for attempted murder. *Id.* Our supreme court has explained that "a merged offense for which a defendant is found guilty, but on which there is neither a judgment nor a sentence, is 'unproblematic' as far as double jeopardy is concerned." *Green v. State*, 856 N.E.2d 703, 704 (Ind. 2006) (citation omitted). Thus, Tavitas was not ineffective for failing to object to the battery charges. *See Overstreet v. State*, 877 N.E.2d 144, 155 (Ind. 2007) (holding that "in order to prevail on a claim of ineffective assistance due to the failure to object, the defendant must show an objection would have been sustained if made.").

## IV. Trial Counsel's Alleged Prejudicial Remarks

[27] Harman next argues that his trial counsel was ineffective for making alleged prejudicial remarks concerning Harman's guilt during the motion in limine

hearing. During the hearing, Tavitas was explaining to the trial court why he believed the protective order was relevant when he stated, "I believe Mr. Harman would even testify he believes that . . . Cathy Jenkins, his third ex-wife, may have actually had some part in putting Mr. Harman up to this crime." Trial Tr. Vol. 2, p. 21. It is clear from the context of the record that Tavitas misspoke; he meant to say that "*Mr. Jenkins* would even testify" and not "Mr. Harman." Cathy is Jenkins's third ex-wife, not Harman's. Thus, Tavitas was simply explaining to the court that he thought Jenkins would testify that Cathy put Harman up to the crime. He was not making a prejudicial comment against Harman. Rather, he was arguing why the protective order Cathy had against Jenkins, and its subsequent violation, was relevant to provide a motive for Jenkins's testimony during trial.

[28] Even if Tavitas testified directly to Harman's guilt, which he did not, Harman still cannot show prejudice because the comments here were not made in front of the jury. *See Parker v. State*, 567 N.E.2d 105, 112 (Ind. Ct. App. 1991), *trans. denied*. The jury has the responsibility to determine Harman's guilt, not the trial court. Harman also argues that Tavitas's statement was the beginning of a pattern whereby "it [was] unclear whether Mr. Tavitas is trying to present 'self-defense' or 'reasonable doubt.'" Appellant's Br. at 18. He maintains that "[b]y making the prejudicial statement to the court above, both defenses were going to receive unfavorable rulings throughout this trial with the judge being privy to such information." *Id.* This argument is without merit for two reasons.

First, on appeal we strongly presume "that a trial court has acted correctly and has properly followed the applicable law." *Moran v. State*, 622 N.E.2d 157, 159 (Ind. 1993). And second, Tavitas repeatedly noted during the post-conviction hearing that self-defense was *not* a defense he raised during trial because that would require Tavitas placing Harman at the scene of the crime, and because Harman decided not to testify. *See* Post-Conviction Tr. pp. 30, 33, 35, 45; *Overstreet,* 877 N.E.2d at 154 (holding "[t]he choice of defenses for trial is a matter of trial strategy."). Thus, Tavitas did not make prejudicial comments regarding Harman's guilt, and to the extent that he allegedly did, he was not infective.

## V. Failure to call Harman as a Witness

Harman next contends that his trial counsel was ineffective for failing to put him on the stand. Our supreme court has explained that "[t]he determination of whether or not a defendant should testify is a matter of trial strategy." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998). During trial, the court explained to Harman outside of the presence of the jury that he had an absolute right to testify. Trial Tr. Vol. 5, pp. 794–95. Harman responded, "My attorney advised me that my testimony is really not necessary, so I choose not to testify." *Id.* at 795. After Harman's statement, Tavitas explained to the court:

> And, your honor, obviously in preparing for this trial for the last several months, especially the last couple of weeks, I've seen Mr. Harman a few times at the Lake County Jail. We have broached this topic as far as whether if he wanted to testify or not. And I explained to him that that's a right he has, even if I advised him,

you know, I didn't think he should, that he still had that [] absolute right. He could trump me, just like whether taking a plea or going to trial.

*Id.* at 795–96. Then at the post-conviction hearing, Tavitas explained his process further:

> [I]n your particular case, Mr. Harman, I know I would have had discussions with you regarding the pros and cons of pleading, or specifically as far as testifying. I would tell you if you testify, then this could -- you know, certain things can happen. If you don't testify, then we might be able to keep things out. . . . I'm absolutely certain I discussed that with you. . . . But, again, if you wanted to testify, I couldn't -- there's absolutely no way I could have stopped you.

Post-Conviction Tr. pp. 35–36. Tavitas could not make Harman testify, and Harman made a conscious decision not to do so.

[31] Moreover, it is unclear what Harman wished to accomplish if Tavitas had forced him to testify, which he could not do. Harman alleges that without putting him on the stand, "self-defense could never be proven." Appellant's Br. at 18. And in the next sentence he proclaims that he "had continued to state he was not the person who committed this crime, and therefore self-defense would never be a viable defense." *Id.* These two consecutive statements plainly contradict each other.

[32] Harman relies on *Faretta v. California*, 422 U.S. 806 (1975), to support his claim that Tavitas did not put on the defense he wanted. However, the Court in

*Faretta* was clear that "when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." *Id.* at 820; *see also, e.g., Overstreet*, 877 N.E.2d at 154. Even if Tavitas did not have such discretion, he still presented the defense that Harman wanted, "reasonable doubt or third-party motive." Appellant's Br. at 19. Tavitas testified during the post-conviction hearing that his defense at trial was "that the State at trial could not prove its case beyond a reasonable doubt." Post-Conviction Tr. p. 33. And during closing arguments, Tavitas consistently attempted to poke holes in the State's case and shift suspicion onto Hanshew. Trial Tr. Vol. 5, pp. 841–67. Tavitas did present a viable defense at trial, and he was not ineffective for not calling Harman as a witness.

## VI. Eliciting Alleged Prejudicial Testimony from the Victim

[33]     Harman next argues that his trial counsel was ineffective for eliciting prejudicial testimony from Jenkins concerning motive for the crime. During direct examination, Jenkins testified that after Harman knocked him to the floor, Harman told him, "Lay there and die, you son of a bitch, you're worth more to us dead than you are alive." Trial Tr. Vol. 3, p. 314. On cross-examination, Tavitas asked Jenkins what he thought Harman meant by that statement, and the following exchange took place:

> [Jenkins]: There was an insurance policy and I had it all signed over to the boys and if I'd died, [Cathy] had custody of the two boys and that insurance policy would have went to the two boys, which she had

custody of. And Mr. Harman would benefit if she come across money and that's my theory of what happened.

[Tavitas]:    And at the time, with these insurance policies, Joe was, he was older than eighteen, correct?

[Jenkins]:    Joe was over eighteen, yeah.

[Tavitas]:    So, as far as you know, would he, the insurance policy won't go to his mom, it would go to him?

[Jenkins]:    It would go to the two boys and the mother had control of both of those boys and the mother would have definitely got her fair share of that money and so would he.

***

[Tavitas]:    Sir, about a year prior to May 31st of 2011, that's when [] you had the insurance policy switched over to both your sons . . . is that correct?

[Jenkins]:    Something like that.

[Tavitas]:    About a year or so?

[Jenkins]:    I would guess that.

Trial Tr. Vol. 3, pp. 378, 385. Harman maintains that by eliciting testimony from Jenkins that some of the money may go to Harman, Tavitas provided motive for the crime. We disagree.

[34]    The evidence before us indicates that Tavitas was attempting to show that Harman was *not* motivated by money to kill Jenkins. The jury had just heard from Jenkins that Harman felt he was more valuable to them dead than he was

alive. Thus, Tavitas used cross-examination to demonstrate that the policy had been amended over a year earlier providing benefits for Jenkins's sons only. Tavitas explained his strategy during the post-conviction hearing, "The issue had to do with insurance, and so that whoever the policy would go to, could be a motive for someone else to commit the crime, for someone else to want the alleged victim killed." Post-Conviction Tr. p. 45. He continued, "Obviously if there's any insurance . . . why in the world would he do that? She's not getting the money. So it could be someone else could have perhaps done the crime, other than Mr. Harman." *Id.* at 48. Tavitas was attempting to show the jury that Harman, in fact, did *not* have the motive that Jenkins had alleged during direct examination, and as such, Tavitas was not ineffective when he cross-examined Jenkins.

## VII. Failure to Present Expert Witnesses

[35] Harman next contends that his trial counsel was ineffective for failing to consult or present expert witnesses. A trial court is not required to appoint any expert that the defendant believes may be helpful, and the defendant bears the burden of demonstrating the need for the appointment, specifying precisely how he would benefit from the requested services. *Watson v. State*, 972 N.E.2d 378, 385 (Ind. Ct. App. 2012). Specifically, Harman argues that his trial counsel should have called expert witnesses: (1) to challenge the voice-mail recording as reliable, (2) to test hair found on the cell phone at the scene of the crime for DNA evidence, and (3) to determine whether it was medically possible for Jenkins to think clearly in the hospital when he identified Harman as his

attacker. Appellant's Br. at 21–22. We initially note that Harman "does not challenge the accuracy of the State's expert testimony nor point to other evidence, which would have formed the basis for a defense expert witness to challenge this testimony." *Troutman v. State*, 730 N.E.2d 149, 154–55 (Ind. 2000).

*A. Voice-Mail Recording*

[36] Regarding the voicemail recording, Harman has not indicated how an expert could have challenged its reliability. Both Hanshew and Cathy identified Harman's voice in the recording at trial. Trial Tr. Vol. 2, p. 168; Vol. 4, p. 690. Further, the voicemail did not prejudice Harman. It was merely cumulative of Hanshew's testimony that Harman called his phone, and Hanshew returned to Jenkins's home where he saw Harman and Jenkins on the front lawn. Trial Tr. Vol. 2, pp. 137–40. Tavitas was not ineffective for not calling an expert to challenge the voicemail recording as unreliable.

*B. Hair Sample*

[37] Harman's argument that Tavitas should have called an expert witness to test the hair sample on the cell phone found at the scene for DNA is speculative at best. The State's expert testified that blood found on the cell phone matched Jenkins. Trial Tr. Vol. 4, p. 595. She also testified that a hair was found on the cell phone, but it was not tested for DNA. Harman, without any evidentiary support, alleges that the hair "more likely than not contained exculpatory evidence." Appellant's Br. at 22. Based on the proximity of the hair to other tested material, it is likely that it belonged to Jenkins. However, even if Tavitas

was deficient for failing to hire an expert to test the hair for DNA, Harman was not prejudiced. The evidence presented to the jury overwhelmingly indicated that Harman was Jenkins's attacker. And "[w]e will not second-guess counsel's strategic decision to put the State to its burden, especially without a showing of prejudice." *Troutman*, 730 N.E.2d at 155. Tavitas was not ineffective for not calling an expert to test the hair sample for DNA.

### C. *Hospital Identification*

[38] Finally, Harman "maintains that a medical expert would have been able to challenge Jenkins'[s] alleged identification of Harman as unreliable due to the trauma and loss of blood he had suffered." Reply Br. at 11. Even if this is true, Jenkins's identification of Harman as his attacker at the hospital was consistent with identification he made immediately after the attack, and the identification he made during testimony at trial. Thus, Jenkins's hospital identification of Harman as his attacker was merely cumulative. Tavitas was not ineffective for not presenting expert testimony regarding Jenkins's hospital identification of Harman.

## VIII.  Failure to Object Under the Best Evidence Rule

[39] Harman next argues that his trial counsel was ineffective for failing to object to the voicemail recording and the hospital note written by Jenkins under the best-evidence rule. At the time of Harman's trial, Indiana Evidence Rule 1002 required the "original writing, recording, or photograph" to prove its content. But under Evidence Rule 1003, "[a] duplicate [was] admissible to the same extent as the original unless (1) a genuine question [was] raised as to the

authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." And Evidence Rule 1001(4) defined a duplicate at the time as:

> a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic rerecording, or by chemical reproduction, or by facsimile transmission, or video tape or by other equivalent techniques which accurately reproduces the original.

Both the voicemail recording and the hospital note were duplicates and were properly admitted under Evidence Rule 1003.

*A. Voicemail Recording*

Tavitas did not object at trial when the State played a recording of the voicemail that Harman left on Hanshew's phone. Harman argues that the recording resulted in "a muffled recording that had to be manipulated by placing it on a laptop in an attempt for the jury to better hear it," Appellant's Br. at 24, and that these circumstances make it unfair to admit it under Evidence Rule 1004. We disagree.

Harman asked Tavitas during the post-conviction hearing why he did not move to suppress the recording, and Tavitas responded, "I'm not certain under what grounds I would be able to suppress it, if that particular witness testified that he knew the contents of the recording." Post-Conviction Tr. p. 50. The police recorded the voicemail directly from Hanshew's phone. Both Hanshew and Cathy testified that the voice on the recording was Harman's. It was played

through an iPad to the jury so that they could properly hear it, and they did. Thus, the recorded voicemail was admissible as a duplicate of the original, and there is no genuine question of its authenticity nor do any circumstances exist that make it unfair to admit the recording.

[42] Moreover, as Harman points out, "The message in [this] recording when played states nothing in it that the Petitioner committed any crime." Appellant's Br. at 25. Therefore, even if Tavitas could have properly challenged the recording, it did not prejudice Harman, and it was merely cumulative of previous testimony. Tavitas was not ineffective for failing to attempt to suppress or to object to the admission of the voicemail recording. *See Overstreet*, 877 N.E.2d at 155.

*B. The Hospital Note*

[43] When detectives visited Jenkins in the hospital, they asked him to identify his attacker. He was unable to speak, so he attempted to write "David" on a piece of paper but became frustrated. He eventually wrote Harman's nickname, "Red." Photocopies of the original notes were admitted at trial. Tavitas objected for a lack of foundation, but he did not object under the best-evidence rule because he had no reason to question the notes' authenticity. Harman alleges that "[t]he trial court made it clear the State should have to produce the original note," Appellant's Br. at 29, and therefore, Tavitas was ineffective for failing to object to its admission under the best-evidence rule. Harman is mistaken. The trial court recognized that there was no issue admitting the duplicate, so long as there was no genuine question that the note introduced at

trial was an authentic copy of the original, which there was not. *See Overstreet*, 877 N.E.2d at 155.

[44] Even if the photocopy of the note was objectionable, Harman cannot show that he was prejudiced by its admission. Detective Schutz testified that Jenkins wrote the note in his presence. And Jenkins identified Harman as his attacker both immediately after the attack and at trial. Tavitas was not ineffective for not objecting to the hospital note under the best-evidence rule.

## IX. Failure to Object to Leading Questions or Hearsay

[45] Harman next contends that his trial counsel was ineffective for failing to object to what he describes as "numerous leading questions and hearsay having to be continually addressed by the Judge." Appellant's Br. at 26. The State contends that Harman has waived this claim on appeal because he failed to support his argument with cogent reasoning. Ind. Appellate Rule 46(A)(8)(a). Although we agree with the State, we will address Harman's claim waiver notwithstanding.

[46] Harman's claim that Tavitas was ineffective for what amounts to a trial strategy fails. During trial and at a discussion outside of the presence of the jury, the court remarked that there had been several leading questions asked and hearsay had come in without objection. Tavitas responded, "To be quite honest, your Honor, there was a few times I was going to object to leading, but honestly, I didn't think the answers were going to be too hurting, so I just chose not to." Trial Tr. Vol. 3, pp. 278–79. Tavitas reiterated his stance during the post-conviction hearing, "It's more of a strategy. Because if you keep on objecting to

leading questions that aren't hurtful as far as answers, I think it gives more -- the jury kind of frowns upon it. Sometimes it seems as though the juries think, 'Oh, you have something to hide.'" Post-Conviction Tr. p. 54. And later he explained, "[I]f it helps move the case along sometimes, and it's not going to hurt my client, yeah, sometimes there's -- yeah, I don't necessarily object to every leading question or every hearsay statement. But if I do believe it's going to hurt my client, then I obviously would object." *Id.* at. 65. We cannot say that Tavitas acted unreasonably by failing to object to leading questions or hearsay that he felt did no harm to his client. *Benefield v. State*, 945 N.E.2d 791, 799–800 (Ind. Ct. App. 2011), *trans. denied*. Therefore, Tavitas was not ineffective here. *See Overstreet*, 877 N.E.2d at 155.

## X.   Failure to Object to Excited Utterance

[47]   Harman next argues that his trial counsel was ineffective for failing to challenge a statement by Jenkins to Jackie identifying Harman as his attacker just after the assault. Although Tavitas did object to the statement at trial as hearsay, the trial court overruled the objection and admitted it as an excited utterance. And the trial court was correct; Harman has no reasonable complaint here.

[48]   Indiana Evidence Rule 803(2) does not exclude hearsay when the statement relates to "a startling event or condition, made while the declarant was under the stress or excitement that it caused." The test for whether a statement is an excited utterance "turns on whether the statement was inherently reliable because the witness was under the stress of an event and unlikely to make deliberate falsifications." *Jenkins v. State*, 725 N.E.2d 66, 68 (Ind. 2000)

(citations omitted). And "[a]lthough the amount of time that passes between the startling event and the statement is not necessarily dispositive, it is one factor to consider when determining the admissibility of statements." *Id.* On appeal, we do not apply a "rigid test of elapsed time." *Young v. State*, 980 N.E.2d 412, 421 (Ind. Ct. App. 2012).

[49] Harman alleges that Jenkins's statement "was not contemporaneous with the event sought to be proven and he did have time to reflect in order to either fabricate or misrepresent his thoughts concerning who had beat him up." Appellant's Br. at 27. He is incorrect. The facts before us indicate that Harman beat Jenkins and slashed his throat, causing him to black out momentarily. When he came to, Jenkins was able to open the front door, slide down the stairs at the front of the house, and stumble four houses down to Jackie's. As soon as he reached Jackie's, she opened the door, and he was able to tell her what happened—Harman had attacked him. Jenkins was able to speak faintly, but audibly. And his statement falls squarely within Evidence Rule 803(2)'s definition of an excited utterance. *See Teague v. State*, 978 N.E.2d 1183, 1188 (Ind. Ct. App. 2012). Therefore, Tavitas was not ineffective for failing to challenge the trial court's proper ruling. *See Overstreet*, 877 N.E.2d at 155.

## XI.  Failure to Object to a Juror Question

[50] Harman next contends that his trial counsel was ineffective for not objecting to a juror question posed to Cathy which asked, "Where and how did you and [Harman] meet?" Trial Tr. Vol. 4, p. 702. Tavitas did not object, and Cathy responded, "We met at a bar." *Id.* A juror question is proper when it "allows

the jury to understand the facts and discover the truth." *Amos v. State*, 896 N.E.2d 1163, 1170 (Ind. Ct. App. 2008), *trans. denied*. Here, Harman alleges that the "question was irrelevant and prejudicial," Appellant's Br. at 30, and thus, Tavitas was ineffective for failing to object to it. We disagree.

[51] This case involved several witnesses and a history of complicated relationships. The juror question here could have reasonably assisted the jury in developing context surrounding the parties testifying and to achieve a better understanding of the factual background. The juror question was not improper. However, even if it was, there is no evidence of any prejudice to Harman. It is common for people to meet in bars, and there was no evidence in front of the jury that alcohol played any role in Harman's attack on Jenkins. Harman alleges that the question prejudiced him "because its answer portrayed him as someone who hangs out in bars." Reply Br. at 13. Nothing in the juror's question, or in Cathy's answer, would lead a reasonable juror to conclude that Harman hung out in bars. The jury simply learned where Harman first met Cathy, which was important to understand the factual context surrounding the case. Tavitas was not ineffective for failing to object to the juror question. *See Overstreet*, 877 N.E.2d at 155.

### XII.   Failure to Object to Alleged Prosecutorial Misconduct

[52] Harman next argues that his trial counsel was ineffective for failing to object to alleged prosecutorial misconduct. Specifically, Harman consistently alleges that the State utilized evidentiary harpooning during his trial. Our supreme court has explained that "[a]n evidentiary harpoon occurs when the prosecution

places inadmissible evidence before the jury for the deliberate purpose of prejudicing the jury against the defendant and his defense." *Overstreet*, 877 N.E.2d at 154. Harman describes three instances of alleged evidentiary harpooning during his trial including: (1) the State asked Hanshew if Harman carried a knife; (2) the State entered a booking photo of Harman into evidence; and (3) the State asked Cathy if Harman owned a motorcycle and what kind. None of Harman's examples constitute an evidentiary harpoon, and there is no evidence before us of prosecutorial misconduct in this case.

*A. Asking about the Knife*

[53] The State presented substantial evidence during trial that Harman slashed Jenkins's throat with some object. The State asked Henshaw during trial if Harman ever carried a knife, and Hanshew responded, "Just for work purposes, yes. He used it quite often at work." Trial Tr. Vol. 2, p. 204. There is nothing inadmissible about this evidence, and even if Tavitas would have objected, it would have been properly overruled. *See Overstreet*, 877 N.E.2d at 155.

[54] Even if the evidence was inadmissible, Harman cannot show that he was prejudiced by it. Hanshew testified that he did not see Harman with a weapon on the day Jenkins was attacked. Harman acknowledges this, but he argues that asking about the knife "was irrelevant and prejudicial since other witnesses had already stated they did not see Harman with a weapon." Reply Br. at 14. Harman is incorrect; "[e]vidence that the defendant had access to a weapon of the type used in the crime is relevant to a matter at issue other than the defendant's propensity to commit the charged act." *Rogers v. State*, 897 N.E.2d

955, 960 (Ind. Ct. App. 2008), *trans. denied.* Tavitas was not ineffective for failing to object to admissible evidence that Harman owned a pocket knife.

### B. The Booking Photo

[55] During cross-examination of Detective Schutz, Tavitas asked if there was a booking photo taken of Harman "to see if there was any type of injury, stab wound on his hip?" Trial Tr. Vol. 5, p. 764. Detective Schutz responded that she was unaware. On redirect, the State properly responded to Tavitas's inquiry of Detective Schutz by offering Harman's booking photograph to show his appearance when he was arrested. Harman alleges that the State offered the booking photo to "prejudice him with the jury showing him with an appearance of a biker." Appellant's Br. at 32. Harman presents no evidence to support his claim, and Tavitas was not ineffective for failing to object to admissible evidence. *See Overstreet*, 877 N.E.2d at 155.

### C. Asking about Harman's Vehicle

[56] Jones testified that before talking to police, Harman beckoned her out on to the front porch of her home and "made the statement that you got my back in this basically, once a biker bitch always a biker bitch." Trial Tr. Vol. 3, p. 240. After Harman made this statement, Jones was called to the police station, and Harman left with Cathy. The State asked Jones what vehicle they used, and she responded that it was Cathy's van. The State then asked if Harman had his own vehicle, and she testified that he owned a Harley Davidson motorcycle.

[57] Harman alleges, without evidentiary support, that this question and subsequent testimony was "used only to prejudice [the] jury against Harman as a violent outlaw biker." Appellant's Br. at 32. We disagree. As previously stated, Harman is the *only* person who refers to himself as an "outlaw biker." The State never argued Harman was an "outlaw biker," and in fact, the word "outlaw" is nowhere in the evidence before us.

[58] Harman cites to *Bagnell v. State*, 413 N.E.2d 1072 (Ind. Ct. App. 1980), and *Oldham v. State*, 779 N.E.2d 1162 (Ind. Ct. App. 2002), *trans. denied*, to support his argument. His reliance is misplaced. In *Bagnell*, the State repeatedly asked the defendant about his prior criminal behavior. 413 N.E.2d at 1076–77. And the prosecutor asked several police witnesses about the defendant's connections to other criminals. *Id.* at 1077. Here, there is nothing criminal about owning a Harley Davidson motorcycle, and the State never presented it in such a way.

[59] In *Oldham*, the State introduced evidence of the defendant's character, as well as unrelated handguns, in an effort to prove his guilt. 779 N.E.2d at 1171–75. Owning a motorcycle is not a character trait, and we agree with the State that "[t]he fact that Harman owned a Harley did not make it any more likely that he attempted to murder Jenkins, and the State did not argue that it did." Appellee's Br. at 41.

[60] Simply put, there is no evidence of prosecutorial misconduct before us, and each piece of evidence Harman takes issue with was admissible. Tavitas was

not ineffective for failing to object to admissible evidence. *See Overstreet*, 877 N.E.2d at 155.

### XIII.   Failure to Protect Harman from a Civil Conspiracy

[61] Harman next contends that his trial counsel was ineffective for failing to protect him from a civil conspiracy. Harman alleges that there was a conspiracy to convict him "through the action of the prosecutor's office, investigating police officers[,] and several witnesses," Appellant's Br. at 34, and that Tavitas should have recognized this and brought a claim on Harman's behalf under 42 U.S.C. § 1985. Section 1985 explains in part:

> if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Harman's argument that he has a valid claim under section 1985 fails.

[62] First, Harman has failed to establish how "two or more persons" conspired against him. He once again asserts part of the conspiracy "included portraying him as an 'outlaw biker.'" Appellant's Br. at 35. However, this is not a conspiracy nor is there any evidence before us that the State attempted to portray Harman as such. And even if there was a conspiracy, Harman would have an action for damages, which would not in any way have affected his trial.

Harman maintains that "if counsel had objected to the conspiracy to use irrelevant evidence to use evidence harpooning portraying him as an outlaw biker during trial, the jury would not have considered this characterization when judging him." Reply Br. at 15. But once again, Harman has characterized himself as an outlaw biker, not the State. And for reasons stated above, there was no evidence harpooning here. Harman was not subjected to a civil conspiracy, and Tavitas was not ineffective for failing to bring a claim based on it.

## XIV. Cumulative Error

[63] Harman's last claim of ineffective assistance of trial counsel is that the cumulative effect of his trial counsel's errors requires us to reverse his convictions and grant him a new trial. Errors by counsel that are not individually sufficient to prove ineffective representation may add up to ineffective assistance when viewed cumulatively. *McCullough v. State*, 973 N.E.2d 62, 75 (Ind. Ct. App. 2012) (citing *Pennycuff v. State*, 745 N.E.2d 804, 816–17 (Ind. 2001)), *trans. denied*. Here, however, Harman has not established that his trial counsel committed any errors. Thus, there are no errors to accumulate.

## Ineffective Assistance of Appellate Counsel

[64] Harman also claims that his appellate counsel was constitutionally ineffective for several reasons. When we review claims of ineffective assistance of appellate counsel, we use the same standard applied to claims of ineffective assistance of

trial counsel, i.e., Harman must show that appellate counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for the deficient performance of counsel, the result of the proceeding would have been different. *Manzano v. State*, 12 N.E.3d 321, 329 (Ind. Ct. App. 2014) (citing *Harris v. State*, 861 N.E.2d 1182, 1186 (Ind. 2007)), *trans. denied*. To show that counsel was ineffective for failing to raise an issue on appeal, the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential. *Id*. (citing *Reed v. State*, 856 N.E.2d 1189, 1195 (Ind. 2006)).

[65] To evaluate the performance prong when counsel failed to raise issues upon appeal, we apply the following test: (1) whether the unraised issues are significant and obvious from the face of the record and (2) whether the unraised issues are "clearly stronger" than the raised issues. *Id*. If the analysis under this test demonstrates deficient performance, then we examine whether "the issues which . . . appellate counsel failed to raise, would have been clearly more likely to result in reversal or an order for a new trial." *Id*. at 329–30.

[66] Ineffective assistance is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel. *Id*. at 330. Indeed, our supreme court has warned that we "should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy," and we "should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the

facts of the case and the precedent available to counsel when that choice was made." *Reed*, 856 N.E.2d at 1196 (quoting *Bieghler v. State*, 690 N.E.2d 188, 194 (Ind. 1997)).

[67] Harman contends that his appellate counsel was ineffective in several ways. We initially note that Harman alleges that his appellate counsel was ineffective for failing to raise on appeal several issues for which he claimed his trial counsel was ineffective, including: (1) not challenging evidence under the best-evidence rule, (2) not raising issues of leading questions or hearsay, (3) not challenging the excited utterance, (4) not challenging the battery charges, and (5) not raising prosecutorial misconduct. For reasons explained above, trial counsel was *not* ineffective on any of these issues. Therefore, appellant counsel was not ineffective for not presenting these issues on direct appeal.

[68] Small explained his process for preparing Harman's appeal at the post-conviction hearing, "I outlined the transcript, and I spoke with [Harman] on a couple of occasions. And then having done that and reviewing the law, I felt that the issues that I raised in the brief were the most pertinent and were the best issues to raise." Post-Conviction Tr. pp. 73–74. Small determined that the best issues to bring on appeal were (1) that the trial court abused its discretion in two evidentiary rulings, and (2) that the trial court abused its discretion in sentencing. Here, Small's choice of issues to bring was reasonable in light of the

facts of the case, *see Bieghler*, 690 N.E.2d at 192, and his decision not to raise losing issues on appeal does not amount to deficient performance.[5]

[69] Harman also claims that his appellate counsel was ineffective for inadequately challenging his sentence. We disagree. On direct appeal, Small argued that the trial court erred "by failing to find [Harman's] prior military service as a mitigating circumstance," and that "the trial court should have found [Harman's] 'limited criminal history' to be a mitigating circumstance." *Harman*, 4 N.E.3d at 218–19.

[70] Regarding military service, a panel of this court stated that Harman had failed to explain why it should be viewed as a mitigator. *Id.* at 218. The panel also noted that "military service is not necessarily a mitigating circumstance." *Id.* *Harman* now alleges that appellate counsel's failure to explain why military service should have been considered a mitigator amounted to ineffective assistance. However, Harman has not explained how Small could have shown that his military service was a significant mitigating circumstance here. And this court reiterated the State's comment during sentencing that "Harman's actions

---

[5] Harman's appellate counsel was also not ineffective for failing to raise ineffective assistance of trial counsel on direct appeal. Our supreme court has explained, "to support [] a claim of ineffective assistance of [trial] counsel, it is often necessary to develop facts beyond those contained in the trial record." *Jewell v. State*, 887 N.E.2d 939, 941–42 (Ind. 2008). Small's decision not to bring such a claim on direct appeal was strategic and reasonable. He explained during the post-conviction hearing that if he had raised the infective assistance claim on direct appeal, "in all likelihood we wouldn't be sitting here for the post[-]conviction relief hearing." Post-Conviction Tr. p. 78; *see Woods v. State*, 701 N.E.2d 1208, 1219–20 (Ind. 1998) (explaining that a post-conviction hearing is the preferred forum for adjudicating an infectiveness claim and if raised on direct appeal, it cannot be presented in a petition for post-conviction relief). Small was not ineffective for not raising ineffective assistance of trial counsel on direct appeal.

were the actions of a monster and not of a Marine[.]" *Harman*, 4 N.E.3d at 218. Harman has not provided a way in which Small could have better presented the issue, nor has he established a reasonably probability that his sentence would have been modified as a result.

[71] Regarding Harman's limited criminal history, our court explained, "The record reveals that Harman had a criminal history, including a Class D felony aggravated driving while intoxicated conviction, a misdemeanor operating a vehicle while intoxicated conviction, and a reckless driving infraction. Accordingly, we cannot say that the trial court erred by rejecting Harman's criminal history as a mitigating circumstance." *Harman*, 4 N.E.3d at 219. Harman alleges that our court pointed out that "Small did not properly present this issue" for appeal. Appellant's Br. at 39. He is incorrect.

[72] Small presented the issue properly, and a panel of this court found that the trial court acted within its discretion when it rejected his criminal history as a mitigating circumstance—an act well within a trial court's discretion. *See Townsend v. State*, 860 N.E.2d 1268, 1272 (Ind. Ct. App. 2007), *trans. denied.* Harman alleges that Small should have brought to this court's attention a statement from the prosecutor that Harman "does not really have a criminal history, but he does have DUI's and things like that." Trial Tr. Vol. 5, p. 785. This statement added nothing to what the trial court already knew based on the presentence investigation report. And Harman cannot show prejudice because the trial court found several valid aggravators. *See* Trial Tr. Vol. 6, pp. 944–46; *Hawkins v. State*, 748 N.E.2d 362, 363 (Ind. 2001) (holding that even a single

aggravator is enough to justify an enhanced sentence). Small was not ineffective for the way in which he challenged the trial court's sentencing discretion on appeal.

## Conclusion

[73] Based on the facts and circumstances before us, the post-conviction court acted within its discretion when it denied Harman's subpoena requests for the jury foreman and Detective Schutz. Further, the post-conviction court did not clearly err when it rejected Harman's claims of ineffective assistance of trial counsel and appellate counsel. Accordingly, we affirm the judgment of the post-conviction court denying Harman's petition for post-conviction relief.

Najam, J., and Barnes, J., concur.