## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 19 2019, 8:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald C. Swanson, Jr.
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Zachary W. Callantine, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff,* | December 19, 2019 <br><br> Court of Appeals Case No. 19A-CR-973 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Frances C. Gull, Judge <br><br> Trial Court Cause No. 02D06-1711-F1-20 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Zachary Callantine was convicted of rape, a Level 1 felony; criminal confinement while armed with a deadly weapon, a Level 6 felony; and strangulation, a Level 6 felony. The trial court sentenced Callantine to an aggregate sentence of forty-four years in the Indiana Department of Correction ("DOC"). Callantine appeals and raises two issues, which we restate as: (1) whether the trial court abused its discretion by excluding evidence of the victim's prior drug use; and (2) whether his sentence is inappropriate in light of the nature of his offenses and character. Concluding Callantine waived appellate review of any alleged error in the exclusion of evidence of the victim's prior drug use and Callantine's sentence is not inappropriate, we affirm.

# Facts and Procedural History

[2] The facts most favorable to the verdict are as follows. E.S. and her boyfriend, Tyler Wedde, were close friends with Callantine. All three had hung out together on numerous occasions but E.S. and Callantine had hung out alone only once. Around 5:15 p.m. on August 21, 2017, Wedde dropped E.S. off at Callantine's apartment. Wedde and E.S. had been fighting and when they arrived, E.S. slammed the car door and walked upstairs to Callantine's apartment. As she entered the apartment, Wedde called E.S. and the two continued to argue via telephone. Overhearing the fight, Callantine offered E.S. relationship advice and tried to instruct E.S. on what to say to Wedde.

E.S. told Callantine, "[T]his is my boyfriend, I can fight with him how I want, . . . I don't want to hear what you have to say, like I can fight myself. I don't need you to fight my battles for me[.]" Transcript, Volume I at 123. At some point, E.S. and Wedde's call ended.

[3] E.S. walked into Callantine's bedroom and sat on the edge of the pull-out bed. E.S. believed Callantine was drunk when she arrived and recalled seeing a bottle of brandy in his room. Callantine offered E.S. a shot but she declined. Callantine stood in the doorway of the bedroom and continued to give unwelcome advice. "[A]ll of a sudden[,]" Callantine's demeanor changed and he ordered E.S. to lay on her back. *Id.* at 125. E.S. testified that Callantine's "face turned red and his eyes were like black" and he screamed at her. *Id.* Sensing that "something [was] not right," E.S. ran toward the door and tried to duck under Callantine's arm to get out of the bedroom. *Id.* Callantine head-butted E.S., which caused her eyes to go "black for a second" and left her "totally disoriented[.]" *Id.*

[4] Callantine then grabbed a serrated knife, held it to E.S.'s throat, and forced her onto the bed. He held the knife so close to E.S.' neck that she believed she had been cut and was bleeding even though she was not. E.S. screamed. Callantine threatened to spray oven cleaner in her mouth if she did not stop screaming and stated that she would never breathe the same way. He also told her that if she moved or screamed, he would slit her throat. Callantine removed the knife from E.S.' throat and began to choke her. E.S. believed she was going to die and was "frightened to [her] core[.]" *Id.* at 128. E.S. began to lose

consciousness and "once [her] eyes started to go black[,]" Callantine realized this and stopped choking her. *Id.*

[5] Using a ratchet strap, Callantine tied E.S.' hands to the bed. Callantine was angry about a check she had written him a week prior that had bounced and had taken $200 out of his account. As a result, Callantine was unable to pay his landlord and asked E.S. how she was going to come up with the money. E.S. assured him that they could come to an agreement to remedy the debt. Callantine revealed to E.S. that he had been planning the attack all day and he intended to kill her. He detailed several ways he had considered murdering her – by skinning her alive or lighting her recently dyed hair on fire. Callantine quoted a movie in which the main character has multiple personalities. E.S. testified that "he was talking about when he got all angry and everything" and then said, "Zach is not here anymore[.]" *Id.* at 126.

[6] As he described his plans, Callantine's penis became erect. He took E.S.' clothes off, told her he has "wanted to do this for a really long time," and asked E.S. if she wanted to have sex. *Id.* at 138. Terrified and tied up, E.S. "just complied with what he said." *Id.* Callantine inserted his fingers into her vagina. He then put a condom on his penis and raped her. After Callantine ejaculated, he immediately stated, "Zach's back," and he began to cry. *Id.* at 126. Callantine instructed E.S. not to tell anyone and out of fear, she agreed. He then untied her and began searching the house for his glasses. E.S. got dressed, grabbed the knife, threw it into the kitchen sink, and fled the apartment. As she ran down the stairs, she heard the door open behind her.

Afraid Callantine might come after her, E.S. ran into the street, got into a stranger's car, and called her mother, who was with E.S.' stepfather. At some point, E.S. got out of the stranger's car and hid in a nearby bush. E.S.' stepfather called the police. Minutes later, police arrived and spoke with E.S. They documented E.S.' injuries, which included an abrasion and redness on her neck, redness on her wrists where she had been tied up, and redness and minor swelling to her forehead. Wedde arrived and drove E.S. to a sexual assault treatment center where she underwent an assessment. Ultimately, she decided to press charges.

[7] Callantine also called the police but alleged that E.S. raped him. Officer Kevin Peeper of the Fort Wayne Police Department responded to the call and went to Callantine's apartment. Callantine told Officer Peeper that he had asked E.S. to come over to talk about the bad check she had written him and when she arrived, she picked up a large metal curtain rod and hit him in the head, knocking him unconscious. Callantine stated that when he regained consciousness about an hour later, he was tied to the bed, had an erection and fluid on his penis, and witnessed E.S. run out of the apartment, which is "why he felt [E.S.] had raped him[.]" *Id.* at 207. Callantine claimed that he had sustained injuries, including a lump on his head. Officer Peeper observed a "small superficial scratch" on the lower left part of Callantine's back but no other visible injuries or redness. *Id.* Callantine also underwent an assessment at a sexual assault treatment center.

[8] On November 14, 2017, the State charged Callantine with forcible rape, a Level 1 felony, criminal confinement while armed with a deadly weapon, a Level 3 felony, and strangulation, a Level 6 felony. While incarcerated in the Allen County Jail, Callantine repeatedly told his cellmate, Glen Dillion, that he planned to get E.S. on video recanting her story and planned to e-mail it to the prosecutor. If E.S. failed to comply, Callantine stated that he would kill her, dispose of her body by burning it or dissolving it in chemicals, and then flee the country. Callantine wrote these plans down and titled it "plan delta." Tr., Vol. II at 78.

[9] Before trial, the State filed a motion in limine seeking to exclude "[a]ny and al[l] comments with reference to prior drug or alcohol use by the victim." Appellant's Appendix, Volume 2 at 52.[1] A jury trial commenced on February 12, 2019. Prior to voir dire, the trial court addressed the State's motion in limine. The State explained there is evidence that E.S. had a heroin addiction but she was not using at the time of the rape and has attended rehab. Therefore, the State argued evidence of her prior drug use was irrelevant. Defense counsel claimed the drug use was relevant to the case:

> During the deposition of the victim, she admitted to be a heroin addict using multiple times per day for a long time, and that she had ingested heroin the night before this alleged incident. She admitted that on the day of this incident that she was so mentally

---

[1] The State later filed an amended motion in limine in open court on the first day of trial addressing additional evidentiary issues. Tr., Vol. I at 16.

and physically sick because of her addiction because she was feening for the drug at that time. She went to [Callantine]'s place on that day . . . specifically to get heroin. She dropped everything she was doing at that point to go to [Callantine]'s place to get heroin. During the deposition she claimed that this is the most traumatic event of her life, but during the deposition she had [a] difficult time putting the pieces together, what happened, when they happened on the day of the incident and in what order they happened. So, it is our position that her drug use the night before and the fact that she mentally and physically craved the drug to the point that it seriously affected her ability to observe what was actually taking place on the day of this incident as well as her ability shortly thereafter the event to recall what had just taken place[.] [A]dditionally, the long term repeated use of heroin that she claimed during the deposition has affected her ability to recall what exactly happened that day.

Tr., Vol. I at 20-21. The trial court granted the State's motion over objection and stated, "[a]s we all know motions in limine are fluid and things happen during trial that aren't anticipated, but at this point, past drug usage of anybody is not relevant, and it is not admissible." *Id*. at 22. Following voir dire, the trial commenced and at no point did Callantine make an offer of proof pertaining to E.S.' drug use and its alleged effect on her memory.

[10] The jury found Callantine guilty as charged. The trial court entered judgment of conviction for rape, a Level 1 felony; strangulation, a Level 6 felony; and criminal confinement, a Level 3 felony reduced to a Level 6 felony. The trial court held a sentencing hearing on April 2, 2019. At the hearing, the trial court found Callantine's lack of a juvenile history a mitigating circumstance and

found the following aggravating circumstances: Callantine's criminal history[2]; the fact that he violated a position of trust; the nature and circumstances of the crime; and the impact on the victim. The trial court sentenced Callantine to an aggregate sentence of forty-four years to be served in the DOC. Callantine now appeals. Additional facts will be supplied as necessary.

# Discussion and Decision

## I. Exclusion of Evidence

Our standard of review in this area is well settled. We review the admission or exclusion of evidence for an abuse of discretion. *Troutner v. State*, 951 N.E.2d 603, 611 (Ind. Ct. App. 2011), *trans. denied*. An abuse of discretion occurs when a trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004).

Callantine argues the trial court erred by excluding evidence of E.S.' prior drug use. Specifically, he asserts that he made an offer of proof that E.S.' drug use is relevant because she was mentally and physically sick the day of the incident, which impaired her memory. In support of this contention, Callantine points to the pre-voir dire discussion on the State's motion in limine pertaining to E.S.'

---

[2] The trial court specifically found that Callantine's criminal history was a slight aggravating circumstance. *See* Tr., Vol. II at 177.

prior drug use. Following the parties' arguments, the trial court granted the motion over Callantine's objection and stated, "[a]s we all know motions in limine are fluid and things happen during trial that aren't anticipated, but at this point, past drug usage of anybody is not relevant, and it is not admissible." Tr., Vol. I at 22.

[13] As the trial court's remark shows, a ruling on a motion in limine does not determine the ultimate admissibility of evidence; that determination must be made by the trial court in the context of the trial itself. *Prewitt v. State*, 761 N.E.2d 862, 871 (Ind. Ct. App. 2002). It is well settled that an offer of proof is required to preserve an error in the exclusion of a witness' testimony. *Dowdell v. State*, 720 N.E.2d 1146, 1150 (Ind. 1999). As our supreme court has explained, the purpose of an offer of proof is to convey the point of the witness's testimony and provide the trial court the opportunity to reconsider the evidentiary ruling. *State v. Wilson*, 836 N.E.2d 407, 409 (Ind. 2005). "To accomplish these two purposes, an offer of proof must be sufficiently specific to allow the trial court to determine whether the evidence is admissible and to allow an appellate court to review the correctness of the trial court's ruling and whether any error was prejudicial." *Id*. And offers of proof are proper only upon direct examination or cross-examination. *Taflinger Farm v. Uhl*, 815 N.E.2d 1015, 1018 (Ind. Ct. App. 2004). Although a party traditionally makes an offer of proof after the trial court has sustained an objection to the admission of the party's evidence, it may also be made before the trial court's ruling on an objection in order to aid in the admissibility ruling. *Harman v. State*, 4 N.E.3d 209, 216 (Ind. Ct. App.

2014), *trans. denied*; *see also* Ind. Evidence Rule 103(2).  Based on our review of the record, Callantine only made argument before voir dire and did not make an offer of proof during trial.  Because Callantine failed to make an offer of proof, he has waived any error in the exclusion of evidence regarding E.S.' prior drug use and its effect on her memory.  *See Dowdell*, 720 N.E.2d at 1150.

## II.  Inappropriate Sentence

### A.  Standard of Review

[14]    Indiana Appellate Rule 7(B) provides this court the authority to revise a defendant's sentence "if, after due consideration of the trial court's decision, [we] find[] that the sentence is inappropriate in light of the nature of the offense and the character of the offender."  Sentencing is "principally a discretionary function" of the trial court to which we afford great deference.  *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008).  "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)."  *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).  It is the defendant who bears the burden of persuading this court his or her sentence is inappropriate under the standard.  *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006).

[15]    On review, the question is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate.  *Fonner v.*

*State,* 876 N.E.2d 340, 344 (Ind. Ct. App. 2007). We may consider any factors appearing in the record in making this determination. *Stokes v. State*, 947 N.E.2d 1033, 1038 (Ind. Ct. App. 2011), *trans. denied.* And whether a defendant's sentence is inappropriate turns on our "sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. The trial court's recognition and non-recognition of aggravators and mitigators serves as an initial guide in our determination. *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017), *trans. denied.*

## B. Nature of the Offense

[16] The advisory sentence is the starting point our legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. The sentencing range for a Level 1 felony is between twenty and forty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4(b). The sentencing range for a Level 6 felony is a fixed term between six months and two and one-half years with an advisory sentence of one year. Ind. Code § 35-50-2-7(b). Here, the trial court sentenced Callantine to the maximum sentence for his rape conviction and two years for each of his other two convictions, six months less than the maximum sentence. Callantine argues that the nature of the offense and his character "did not warrant a maximum sentence on Count 1[,]" namely his rape conviction. Appellant's Brief at 16.

[17] The nature of the offense is found in the details and circumstances surrounding the offense and the defendant's participation therein. *Perry v. State,* 78 N.E.3d 1, 13 (Ind. Ct. App. 2017). When evaluating a defendant's sentence that deviates from the advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that distinguishes it from the typical offense accounted for by our legislature when it set the advisory sentence. *Moyer v. State*, 83 N.E.3d 136, 142 (Ind. Ct. App. 2017), *trans. denied*.

[18] Callantine concedes that the nature of the offense is "undisputedly egregious" but argues that his offense was an isolated act of sexual misconduct rather than continued sexual abuse. Appellant's Br. at 17. We are unpersuaded by Callantine's argument. In this case, Callantine lured E.S., a friend, to his apartment where he attacked her, held a knife to her throat, tied her to his bed, strangled her, described the gruesome ways he planned to kill her, and then raped her. There is no question that the details surrounding the offenses are egregious and disturbing.

[19] The trial court also considered the "extraordinary impact on [his] victim that is well in excess of what is normally contemplated by a level one felony by our legislature." Tr., Vol. II at 178. At the sentencing hearing, E.S. testified to the trauma she has endured, and continues to endure, as a result of Callantine's offenses:

> I have been to hell and back. I thought I had friends who cared
> about me. . . . Callantine was somebody I considered to be a

friend. He turned out to be somebody who I thought would single handedly take[] me off this earth. I will be forever scared and have crippling PTSD bringing me back to that day. I will never be able to get the imagine [sic] of [Callantine]'s pure rage out of my head. . . . It hurts my heart just to talk about [t]his incident. August 21st was the worse [sic] day[] of my life, hands down. I have had to go to [a] rehabilitation center and receive intense therapy stemming from this trauma. I quit college. I lashed out at my family and friends. I tried everything I could to get away from this traumatic event[.]

*Id.* at 169-70. Based on the violent and sinister nature of Callantine's offenses, and the severe impact on E.S., we cannot conclude his sentence is inappropriate based on the nature of the offense.

## C. Character of the Offender

[20] Next, we evaluate whether Callantine's character renders his sentence inappropriate. The "character of the offender" portion of the Rule 7(B) standard refers to the general sentencing considerations and relevant aggravating and mitigating factors, *Williams v. State*, 782 N.E.2d 1039, 1051 (Ind. Ct. App. 2003), *trans. denied,* and permits a broader consideration of the defendant's character, *Anderson v. State*, 989 N.E.2d 823, 827 (Ind. Ct. App. 2013), *trans. denied*. "A defendant's life and conduct are illustrative of his or her character." *Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018), *trans. denied*.

[21] In examining a defendant's character, one relevant factor is his or her criminal history, the significance of which "varies based on the gravity, nature, and

number of prior offenses in relation to the current offense." *Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007). Here, the trial court considered Callantine's lack of juvenile history a mitigating circumstance but found Callantine's adult criminal history a slight aggravating circumstance. According to the pre-sentence investigation report, Callantine was convicted in 2015 of operating a vehicle with a Schedule I or II controlled substance in his body, a Class C misdemeanor. *See* Appellant's App., Vol. 2 at 62. Although the nature of his previous conviction is unrelated to the current offense, this court has held that "[e]ven a minor criminal record reflects poorly on a defendant's character[.]" *Reis v. State*, 88 N.E.3d 1099, 1105 (Ind. Ct. App. 2017). Therefore, Callantine's criminal history, albeit short and generally unrelated to his current offense, reflects poorly on his character.

[22] The trial court also found Callantine's position of trust, as E.S.' friend, an aggravating circumstance and reflective of his character. At sentencing, the trial court stated, "The violation of the position of trust that you decline to accept, . . . you and [E.S.] were friends. You can't just all of a sudden just say no we weren't. She expected to be safe in your presence, and you are a predator Mr. Callantine, a scary predator. You are extraordinarily manipulative and extraordinarily bright, and that is an extraordinarily scary combination sir." Tr., Vol. II at 178. We agree that this violation of trust reveals Callantine's lack of character. *See Garner v. State*, 7 N.E.3d 1012, 1016

(Ind. Ct. App. 2014) (declining to revise a defendant's sentence because his "abuse of his position of trust was demonstrative of his lack of character.").[3]

[23]   Lastly, Callantine's behavior while incarcerated demonstrates a lack of remorse and reflects poorly on his character.  At trial, Callantine's cellmate testified that Callantine stated that he planned to get E.S. on video recanting her story and if she refused, he would kill her and dispose of her body by dissolving it in chemicals or burning it.  We cannot conclude Callantine's character is so stellar as to render his sentence inappropriate.

[24]   In sum, we are unpersuaded that Callantine's forty-four-year sentence is inappropriate in light of the nature of the offenses and his character.  As such, we decline to revise his sentence.

# Conclusion

[25]   We conclude that Callantine waived appellate review of any alleged error in the exclusion of evidence of E.S.' prior drug use and that Callantine's forty-four-year sentence is not inappropriate in light of the nature of the offenses and his character.  Accordingly, we affirm.

---

[3] Callantine argues that the trial court considered his lack of juvenile history but "failed to give credit to any other potential mitigators."  Appellant's Br. at 18, n. 4.  At the sentencing hearing, the trial court acknowledged that Callantine requested it consider several mitigating circumstances, but the trial court declined to do so.  However, Callantine fails to develop a cogent argument supported by legal authority with respect to these issues and accordingly, these issues are waived.  Ind. Appellate Rule 46(A)(8)(a).

Affirmed.

Mathias, J., and Pyle, J., concur.